Elizabeth G. MILLER, Appellant,

v.

BENEFICIAL MANAGEMENT CORPO-
RATION, A Corporation of the State of
Delaware; Beneficial Management Cor-
poration of America, A Corporation of
the State of Delaware; Beneficial Cor-
poration, A Corporation of the State of
Delaware.

No. 91–5930.

United States Court of Appeals,
Third Circuit.

Argued July 16, 1992.

Decided Oct. 21, 1992.

Aron M. Schwartz (argued), Vogel, Chait, Schwartz & Collins, Morristown, N.J., for appellant.

S. Joseph Fortunato (argued), Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for appellees.

Before: SCIRICA, ROTH and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this employment discrimination case, the district court granted summary judgment for defendants, holding that plaintiff's claims were barred by the applicable statutes of limitations and, in the alternative, that there were no material factual disputes and defendants were entitled to judgment as a matter of law. *Miller v. Beneficial Management Corp.*, 776 F.Supp. 936 (D.N.J.1991) ("Letter Opinion"). We will reverse.

## I. FACTS AND PROCEDURAL HISTORY

### A.

Defendant Beneficial Management Corporation is in the business of providing management services. The Government Relations Department of Beneficial is involved in lobbying, organizing political action committees, and collecting political contributions.

Plaintiff Elizabeth Miller was born in 1927 or 1928. She graduated from law school in 1980. In October 1980, Beneficial hired Miller as an Associate Counsel in Beneficial's Legal Department. Miller's starting salary was $25,000. By 1983, Miller's annual salary had increased to $31,000,

with a year-end bonus of $3,000. Salary increases and year-end bonuses at Beneficial are awarded based on merit.

In the Legal Department, Miller reported to Charles Hance, Esq., Senior Vice President and General Counsel. In 1983, Hance prepared a formal review of Miller's performance in the Legal Department. At Beneficial, a formal review is referred to as a "Bentrak." Hance ranked Miller eighth out of eight attorneys who reported to him. The 1983 Bentrak gave Miller good marks with respect to her organizational and planning skills, motivation, initiative and energy, but rated her overall performance as below expectations. It noted a difficulty in providing practical advice satisfactory to senior personnel. It also stated Miller had to improve her personal impact in order to be effective in her position.

Charles Walsh (on whose compensation Miller bases her equal pay claim) was hired by Beneficial in October 1966. Walsh graduated from law school in 1954 and worked for two years at a Philadelphia law firm. In 1956, Walsh joined the Pennsylvania Attorney General's office as an associate counsel for the Insurance Commission. At the Attorney General's office, Walsh was promoted to general counsel and subsequently to deputy insurance commissioner for Pennsylvania. In 1963, Walsh became the executive vice president of Reliable Insurance Company. Around May 1, 1966, Walsh became deputy insurance commissioner for the Commonwealth of Kentucky.

Walsh began his employment at Beneficial as Director of Insurance Relations. In 1968, Walsh was promoted to Assistant Vice President. In 1973, Walsh was asked to join the Legal Department as Assistant Vice President, Associate Counsel. Walsh also represented Beneficial in various trade organizations and became Chairman of the Board of the Consumer Credit Insurance Association. In 1976 or 1977, Walsh was promoted to Vice President of Government Relations.

In 1975, Kenneth Raatz was hired as an Associate Counsel in the Legal Department. Raatz was assigned to work with Walsh and Senior Vice President Helmuth Miller in Government Relations, where he assisted Walsh in the review of legislation.

In 1979 or 1980, Helmuth Miller resigned and was replaced by David Ward. Ward assumed Miller's responsibilities as Senior Vice President. Walsh testified he had less authority and independence under Ward. Walsh's compensation while in Government Relations ranged from a base salary of $41,000 and a year-end bonus of $14,000 in 1977 to a base salary of $55,000 and a year-end bonus of $28,500 (for a total of $83,500) in 1984.

In early 1984, Ward informed Elizabeth Miller that Walsh's and Raatz's employment in Government Relations would soon be terminated. Ward invited Miller to join the Government Relations Department to replace Walsh and Raatz.

Miller alleges Ward told her that with hard work she would become a Vice President and would receive compensation at a level equivalent to Walsh's. Miller joined Government Relations on July 1, 1984. Her base salary was increased by $9,000 to $40,000 per year. Miller was assigned Walsh's office and both Walsh's and Raatz's secretaries.

In a March 14, 1984 memorandum to David Farris (President and CEO of Beneficial Management Corporation), Ward stated:

As you know, I am consolidating two attorney positions into one and Charles Walsh and Ken Raatz will be leaving July 1.

To keep costs down I have arranged to fill the position with an in-house lawyer, Beth Miller, and to do so I am recommending a salary increase for her in connection with the transfer to $40,000 commencing July 1, 1984.

Mrs. Miller brings with her an excellent academic background and four years of experience with us. After some earlier concerns [*see* the 1983 Bentrak], Mr. Hance has ·indicated that her performance has improved greatly. I have worked with her, on bankruptcy in particular, and am thoroughly convinced of her

capabilities and of her potential in the Government Relations Department.

With this transfer we will be upgrading our capability at a cost, including the increase, of about 30% of our current cost. I have reviewed about 100 resumes and I believe that to find an outside replacement of equivalent background would cost at least $10,000 more and probably double that. Also, there would be a substantial learning period involved with any outside attorney regardless of experience.

This recommendation is, in my opinion, justified and will result in a satisfied and productive employee, and will be a low cost solution both long-run and short-run....

On May 31, 1984, the Management Salary Committee approved Ward's recommendation that Miller "be transferred to the Government Relations Department as Associate Counsel replacing Messrs. C. Walsh and K. Raatz, effective July 1, 1984." The Committee also approved the proposed salary increase.

In a June 6, 1985 memo to Finn Caspersen, Beneficial's Chairman of the Board, Ward recommended Miller be promoted to Assistant Vice President. Ward stated:

[Miller] joined Government Relations July 1, 1984 taking over the Associate Counsel slot occupied by Ken Raatz, but also took on many of the duties of Charlie Walsh, who was not replaced.

She has performed very well, and after a few months of intensive background training, is making a real contribution. She is now effectively performing Walsh's functions, with many of the other functions being pushed down to the two individual's [sic] who work for her. She is presently in Grade 15 which is an Assistant Vice President slot, and should be promoted in recognition that she has taken over duties formerly performed by a Grade 17 Vice President....

I recommend a promotional increase of 10% of her current salary of $43,000 for an increase of $4300 to the annual rate of $47,300....

On June 15, 1985, Miller was promoted to Assistant Vice President and her annual salary increased to $47,300.

In January 1986, Miller first spoke to her superiors about being promoted to Vice President of Government Relations. Farris and James Gilliam, Senior Vice President and General Counsel, told her to speak to Ward. In March 1986, Miller spoke to Ward about a possible promotion. Ward handed Miller a Bentrak he had prepared. The 1986 Bentrak was paraphrased by Beneficial in its 12G Statement as follows:

In the category of "Interpersonal Skills," it was noted that [Miller's] motivation was excellent, but that she had problems in communications and in supervising subordinates. With regard to "Professional Skills," an improvement was noted in substantive knowledge, but also a consistent tendency to jump to conclusions without fully understanding the problem. The Bentrak stated that [Miller's] inability to distinguish important legislation from unimportant ones adversely affected her productivity. The Bentrak did note that her technical skills such as bill drafting and analysis were good and improving and stated that these skills should continue to improve as she gained a better understanding of the business context. With regard to "Management Skills," it was noted that [Miller's] initiative, energy, dependability and ambition were excellent, with the caveat that her ambition sometimes appeared excessive. It also was noted that [Miller's] attitude toward others was considered condescending and counterproductive. In addition, the Bentrak stated that her decision-making ability suffered from her reluctance to inquire into the background of matters and to ask penetrating questions.... Finally, the Bentrak noted that [Miller's] judgment was not trusted by some and suggested that this may have been due to [Miller's] relative lack of business and industry experience.

Miller and Ward discussed the 1986 Bentrak at a weekend office meeting, at which time Ward agreed not to put the 1986 Bentrak in Miller's personnel file.

Throughout 1986 and 1987, Miller spoke to Ward about becoming a Vice President. Miller maintains that Ward responded by saying that she was "making the money" and therefore didn't need the title. In January 1987, Miller received a year-end bonus of $8,000, plus an increase in her base salary to $50,200. Miller states that throughout this period her workload increased, partly as a result of Ward's additional responsibilities in other areas, which detracted from the time he was able to spend on Government Relations work. In an October 23, 1987 memo to Caspersen, Ward recommended Miller for a salary increase, stating:

Mrs. Miller has done an excellent job in the past year, assuming quite a bit more work from me while I was involved in much of the restructuring and expense control activity over the past 15 months or so. This [increase] will also bring her more closely in line with salaries in the legal department for lawyers of similar seniority, where it is my understanding she has lagged behind for a few years.

By memo of February 25, 1988, Ward recommended that Miller be promoted to Vice President, stating:

Would like to recommend that she be given V.P. title promotion—no concurrent pay increase. Three reasons—deserved [sic] improvement in performance handling state GR matters in past year and this will help her in dealing with matters when I'm gone and very importantly will help our image with women legislators and this is becoming more important all the time.

On March 4, 1988, Ward took a leave of absence from Beneficial to participate in an eleven-week program at Harvard University. During Ward's absence, Miller was instructed to handle state legislation and administrative matters. The district court stated that "[t]he Government Relations Field Directors were to review any major policy decisions with Caspersen or Farris and all federal Government Relations mat-

ters were to be referred to an outside consultant." Letter Opinion at 947. However, as the district court notes, "Miller presents a different account of her duties during Ward's leave of absence." Id.[1] Miller testified that "[w]hile Ward was at Harvard, I ran the Government Relations Department without supervision by David Farris, Finn Caspersen or any other higher ranking executive."

Ward returned to Beneficial on May 23, 1988. A few days later, Miller approached Ward regarding a promotion to Vice President. Miller contends the conversation went as follows:

Ward responded that he had recommended to Finn Caspersen earlier in the year ... that I be made a Vice President and that Caspersen had turned down that recommendation.... When I asked Ward why he had not told me of this previously, he simply said something about it being a "white lie." Ward then went on to say that I would never get the title of Vice President and that Finn Caspersen had the total say in the matter. I then told Ward that Mary Ann Schneider had recommended that I draft a JAQ [Job Analysis Questionnaire] for the committee which evaluated promotions. Ward laughed and said that the committee did not make those decisions.

Miller claims that Ward told her "your best bet is to leave and sue on age discrimination" and to go work for the government, which could not discriminate on the basis of age. Miller also contends that Ward asked her how long she intended to work if she got the title of Vice President. Ward states he never told Miller she should sue for age discrimination.

Ward allegedly told Miller that he would recommend her for Vice President in July 1988 and that she should compile a list of Beneficial's recent promotions from personnel. Miller maintains that Ward suggested she ask Gilliam to assign her to another attorney\position so Ward could hire some-

---

1. In ascertaining the existence of material factual disputes on a motion for summary judgment, the court is required to resolve all inferences, doubts, and issues of credibility against the moving party. *EEOC v. Westinghouse Elec. Corp.*, 725 F.2d 211, 216 (3d Cir.1983) (citations omitted), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984).

one who would be able to take over his position in three or four years. Ward concedes that he and Miller spoke of a replacement for him. Ward states, however, that he told Miller she would most likely not replace him because he intended to stay at Beneficial for another 17 years, until he reached retirement age. Ward has since left Beneficial.

According to Miller, Ward suggested that Caspersen might promote her to Vice President if Ward could hire someone to eventually replace himself. Miller indicated that if she were not going to make Vice President, she would be interested in an available Field Director (lobbyist) position. According to Miller, Ward told her the position was not available because he could not have Miller carrying home drunks late at night.

On May 31, 1988, Miller had a conversation in her office with Helen Perry (Miller's secretary, and Walsh's former secretary), which Miller secretly taped. Within a few days, Miller informed Ward that she had taped the conversation with Perry. According to Ward, he felt the taping incident was sufficient grounds to terminate Miller's employment and told Miller that he would no longer recommend her for a promotion.

However, on June 17, 1988 Ward sent a memo to Caspersen stating:

> When I brought up Beth Miller in February you indicated that this should wait till mid-year as there would be no more promotions till then. There have been a number apparently, Neff, Bulger, Farrell and Caamano. Does this change anything or does it still have to wait?

On August 2, 1988, Miller asked Ward what the results had been of his proposal to promote her. In her affidavit, Miller states:

> Ward responded that I had been turned down for Vice President by David Farris and Finn Caspersen. When I asked Ward if I could speak with Caspersen about the subject, Ward said I would be "out the door" if I tried to do so. Ward

agreed that I could speak with David Farris and Mary Ann Schneider about the Vice President title.

That same day, Schneider advised Miller to prepare a list of job responsibilities including a list of ten tasks she had recently performed. Miller prepared the list and submitted it to Farris. Miller met with Farris later that afternoon. Miller contends that Farris told her that he and Caspersen had not turned her down for the promotion and would consider it at the end of the year.[2] In addition, Farris told Miller to complete a Job Analysis Questionnaire. Miller completed the 1988 JAQ on August 29, 1988, and delivered it to Ward on August 30, 1988.

Ward completed a Bentrak for Miller on August 24, 1988. On September 1, 1988, Ward added comments from the never-filed 1986 Bentrak to the 1988 Bentrak. On that same date, Ward received Miller's 1988 JAQ requesting that her job be upgraded to Vice President. Ward told Miller that she would never become a Vice President and that they would have to discuss her performance. Miller became upset, and Ward requested that Lawrence Cole, Vice President of Human Resources, attend their meeting. Miller remained upset and was taken home; she did not return to work until September 26, 1988.

After the September 1 meeting, Ward drafted an addendum to Miller's 1988 Bentrak (although he later did not include the addendum in the 1988 Bentrak). The addendum provided:

> Your position as attorney for the Government Relations Department requires you to earn the trust and respect of those you deal with, including your immediate supervisor, top management, the staff at headquarters, and the Government Relations Directors. In this latest incident on September 1, 1988 you have definitely lost the trust of your immediate supervisor.
>
> I told you shortly after returning from Harvard [in May 1988] that the question

**2.** This testimony alone may create a material factual dispute as to whether equitable tolling applies to Miller's failure to promote claim. *See* section IV(D), *infra.*

of your promotion had been discussed with my superiors, that no promotion would be forthcoming, and that a promotion would not be recommended again this year. You were also specifically told by me that I considered your secret taping of a meeting with Helen Perry to have been a serious mistake and very poor judgment on your part. Despite this, I learned that you had nevertheless proceeded to approach Mr. Farris, Ms. Schneider, and Mr. Cole in an apparent attempt to have them obtain a promotion for you. While you no doubt have a right to seek a promotion if you wish, doing so under these circumstances indicates to me a lack of common sense.

On September 19, 1988, during her absence from work, Miller wrote Ward a letter alleging unethical and discriminatory practices at Beneficial. When Miller returned to work on September 26, Cole and Schneider questioned Miller about the September 19 letter. As a result of that letter, an internal investigation of Miller's employment history at Beneficial was conducted. Ward removed most of Miller's principal duties upon her return to work.

On September 30, 1988, Miller telephoned Walsh to discuss with him her frustrations at Beneficial. During their conversation, Walsh told Miller that his compensation when he left Beneficial in 1984 was a base salary of $55,000 and a year-end bonus for 1983 of $28,500. Walsh also told Miller that Raatz had received a base salary of $40,500 and a year-end bonus of $6,500 for 1983.

On October 3, 1988, Ward submitted to the Human Resources Department a written response to Miller's 1988 JAQ. On October 5, 1988, Human Resources advised Ward that Miller's position should remain at the same salary-grade level. The 1988 Bentrak was signed and given to Miller on October 14, 1988. Miller stated that she would respond after her attorney reviewed the Bentrak. On October 20, 1988, Miller was removed from Government Relations and re-assigned to the Legal Department, where she would again report to Hance, as Assistant Vice President and Associate Counsel.

On December 13, 1988, following a conversation with Ward, Caspersen dictated a memorandum to the file (with copies to Farris, Gilliam, and A.C. Halvorsen), stating that:

> ... I further advised [Ward] that I thought his management of the Beth Millier [sic] situation had not been appropriate. I reminded him that he had recommended her for a 10% raise in 1987 and that he had continually recommended her for a promotion to VP. He stated that he thought the problem had arisen since June and not before but I took issue with him on that.

On December 14, 1988, Miller was informed that her removal from Government Relations would be permanent. That same day, Miller received a memorandum from Hance stating the reasons for her transfer and directing her to discuss the 1988 Bentrak with him. On December 19, 1988, Miller met with Hance to discuss the 1988 Bentrak.

Although company policy provided that Bentraks would be done at least yearly, the 1988 Bentrak was the only one completed (with the exception of the 1986 Bentrak that was never placed in Miller's personnel file) for Miller during her tenure in Government Relations. Miller's salary raises, however, in each of her four years in Government Relations exceeded 5%, which, at least in 1987, was the benchmark for performance above expectations.

On December 22, 1988, after Miller had been transferred from Government Relations, the Executive Committee considered and denied Miller's request for a promotion. Because her claim to a promotion stemmed from the broad scope of her duties in Government Relations and the fact that Walsh had been a Vice President, Miller contends that her transfer eliminated any possibility of her being promoted to Vice President. Therefore, she no longer contends that the Executive Committee's subsequent decision to deny her a promotion was itself discriminatory. Brief for Appellant at 12 n. 13.

Plaintiff's employment with Beneficial ended January 6, 1989. According to Beneficial, she resigned. Letter Opinion at 29 n. 19; Brief for Appellees at 15.

### B.

On February 27, 1989, Miller filed a charge of employment discrimination with the EEOC. On July 20, 1989, Miller filed a complaint in the United States District Court for the District of New Jersey alleging discrimination under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d)(1); the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.;* the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–1 *et seq.;* and the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et seq..* On November 21, 1989, Miller filed an amendment to her complaint alleging discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*

On July 24, 1990, Miller's claim under the New Jersey Conscientious Employee Act was dismissed for lack of pendent jurisdiction. Defendants moved for dismissal and/or summary judgment on Miller's remaining claims. On April 30, 1991, Magistrate Hedges entered an order which provided, in part (emphasis added):

> All additional discovery in this matter is stayed pending disposition of defendants' Motion To Dismiss and/or For Summary Judgment. Plaintiff's opposition to defendants' Motion To Dismiss and/or For Summary Judgment shall be served on defendants on May 10, 1991; defendants' reply shall be served on plaintiff on May 24, 1991.
>
> Nothing in this Order shall be construed as limiting plaintiff's right to respond to defendants' Motion to Dismiss and/or For Summary Judgment by filing an affidavit pursuant to Fed.R.Civ.Pro. 56(f) *or by otherwise arguing that additional discovery is necessary before the Court rules on defendants' motion.*

As of April 1991, only Charles Walsh's deposition had been taken. The deposition of Helen Perry Reilly, secretary to both

Miller and Walsh, took place on July 5, 1991.

The parties' submissions on defendants' motion to dismiss and/or for summary judgment were filed with the district court on August 7, 1991. Miller also filed a cross-motion for leave to amend her complaint to assert a cause of action under the New Jersey Equal Pay Act and to compel certain discovery denied by the magistrate.

In a letter opinion filed October 18, 1991, the district court granted defendants' motion for summary judgment and dismissed Miller's complaint with prejudice. It denied Miller's cross-motion to compel discovery as untimely and as moot. In granting summary judgment, the district court held that all of Miller's federal claims were barred by the applicable statutes of limitations,[3] and also that defendants were entitled to summary judgment on the merits.

## II. JURISDICTION

The district court had jurisdiction of plaintiff's claims of age and sex discrimination under 28 U.S.C. § 1331 and the doctrine of pendent jurisdiction. We have appellate jurisdiction of the district court's order granting summary judgment for defendants under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

In our plenary review of the district court's grant of summary judgment, we must apply the same test the district court should have utilized initially. Therefore, we must determine whether the evidence, viewed in the light most favorable to Miller, demonstrates that there are no genuine issues of material fact and that defendants are entitled to judgment as a matter of law. *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1413 (3d Cir.) (in banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 379, 116 L.Ed.2d 330 (1991).

We review discovery rulings for abuse of discretion.

---

**3.** The district court then dismissed Miller's claims under the New Jersey Law Against Discrimination for lack of supplemental jurisdiction.

## IV. TIMELINESS

The district court held that none of Miller's claims was timely filed. Miller contends that her claims were timely because: (1) they accrued within the applicable limitations periods; (2) they allege continuing violations, for which the statutes of limitations begin to run on the date of the last occurrence of discrimination, rather than the first; and (3) defendants' deceptive conduct equitably tolled the relevant statutes of limitations. We will address each of these contentions in turn.

### A. APPLICABLE STATUTES OF LIMITATIONS

Claims arising under the EPA must be filed within two years of accrual of the cause of action, except in cases of willful violations, in which the limitations period is three years. Beneficial concedes that Miller has alleged willful violations of the EPA and that the applicable limitations period is three years.

■ The ADEA incorporates by reference the statute of limitations under the EPA. *See* 29 U.S.C. § 626(e)(1); *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 26 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). In deferral states, it also requires filing of a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." *See Seredinski v. Clifton Precision Prods. Co.*, 776 F.2d 56, 63 (3d Cir.1985) (Pennsylvania); *Bihler v. Singer Co.*, 710 F.2d 96, 97 (3d Cir.1983) (New Jersey). Under Title VII, plaintiffs likewise must file a charge with the EEOC "within 300 days of when the alleged unlawful employment practice occurred." *Seredinski*, 776 F.2d at 61.

### B. ACCRUAL OF CAUSES OF ACTION

■ In employment discrimination suits, the proper focus of the statute of limitations inquiry "is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (emphasis in original). However, if the alleged discriminatory conduct is a "continuing violation," the statute of limitations begins to run on the date of the last occurrence of discrimination, rather than the first. *Bronze Shields, Inc. v. New Jersey Dept. of Civ. Serv.*, 667 F.2d 1074, 1081 (3d Cir. 1981), *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982).

■ The district court found that the statute of limitations on all of Miller's claims began to run when she first joined Government Relations in July 1984. The district court stated (Letter Opinion at 956; citations omitted):

The contradictions in Miller's statements and Miller's heightened knowledge and sensitivity to the issues of employment discrimination are persuasive evidence that if Miller did not know, she should have known she did not receive the same salary as Walsh when she replaced him in Government Relations. Accordingly, from a view most favorable to Miller, she had at least constructive knowledge she was not making the same salary as Walsh when she accepted the position in Government Relations. The statute of limitations began to run when Miller formally assumed the position in Government Relations in July 1984.

The statute of limitations also began to run in July 1984 for Miller's claim for failure to be promoted to Vice President. The Complaint alleges she was discriminated against when her position was established in Government Relations. Miller does not assert she was unaware that Walsh's position was Vice President when she accepted the position as Associate Counsel. Accordingly, Miller had actual knowledge of any alleged discrimination at the time she accepted and assumed the position in July 1984.

Miller contends that she did not discover the disparity in pay between herself and Walsh until September 30, 1988, when she spoke to Walsh by telephone. In her affidavit, she testified that Ward repeatedly told her, in 1986 through 1988, that her compensation was on a par with Walsh's.

The parties dispute whether Miller could have obtained access to Walsh's personnel file in order to ascertain whether her compensation was in fact on a par with Walsh's. The record does not appear to resolve this question. Furthermore, if Miller believed Ward's alleged representations, she would have had no reason to check Walsh's personnel file.

On the present record, a reasonable jury could find that Miller did not know, and should not have known, of the disparity in compensation between her and Walsh until she spoke with Walsh on September 30, 1988. Therefore, the district court should not have granted summary judgment for defendants as to the timeliness of Walsh's equal pay claims.[4]

■ On the failure to promote claims, Miller contends the statute should not begin to run until she was removed from the Government Relations department in October 1988, at which point it became apparent that she would not be made a Vice President. According to Miller's affidavit, Ward told her in September 1987 that she deserved to be a Vice President and that he would get the title for her. Miller testified that Ward told her in January 1988 that she would soon be getting the title of Vice President. Ward recommended Miller for promotion to Vice President in February and June of 1988. There is no indication in the record that the promotion was formally denied until December 1988 (although Miller concedes that denial of the promotion was a foregone conclusion after her transfer from Government Relations in October 1988). In light of these facts, we cannot accept the proposition that, as a matter of law, the statute began to run on the failure to promote claim in 1984, when Miller joined Government Relations. A reasonable jury could agree with Miller that the statute did not begin to run until October 1988, when she knew or should have known that she would never be made a Vice President. *See Colgan*, 935 F.2d at 1418 ("an alleged unlawful employment practice ...

must have inflicted harm which was or should have been noticed, or it will not have triggered the limitations period"). Summary judgment was therefore inappropriate as to the timeliness of Miller's failure to promote claims.

## C.  *CONTINUING VIOLATIONS*
### 1.  EQUAL PAY CLAIMS

■ Most courts appear to treat pay discrimination claims as continuing violations. *See, e.g., Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir.1982) ("Furthermore, the discrimination was continuing in nature. Hall suffered a denial of equal pay with every check she received.") (citing *Satz v. I.T.T. Fin. Corp.*, 619 F.2d 738 (8th Cir.1980); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978)). As the United States Court of Appeals for the Sixth Circuit noted in *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050 (5th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973):

> Sex-based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act.... To hold otherwise would permit perpetual wage discrimination by an employer whose violation of the Equal Pay Act had already lasted without attack for over two years.

The EEOC's regulations, to which we owe substantial deference, *see Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1971); *International Union of Elec., Radio & Mach. Workers v. Westinghouse Elec. Corp.*, 631 F.2d 1094, 1106 (3d Cir.1980), *cert. denied*, 452 U.S. 967, 101 S.Ct. 3121, 3122, 69 L.Ed.2d 980 (1981), are in accord:

> It is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the applicable statute of limitations period for filing a timely suit under the EPA. The employer's continued failure to pay the member of the lower paid sex the wage rate paid to the higher paid predecessor

---

4. The district court relied in part on what he found to be inconsistencies in Miller's testimony in finding that Miller knew or should have

known about the pay disparity. Letter Opinion at 956. However, credibility issues ordinarily are not to be resolved on summary judgment.

constitutes a prima facie continuing violation. Also, it is no defense that the unequal payments began prior to the statutory period.

29 C.F.R. § 1620.13(b)(5).

As noted above, if the alleged discriminatory conduct is a "continuing violation," the statute of limitations begins to run on the date of the last occurrence of discrimination, rather than the first. Because Miller received her last Government Relations paycheck sometime around October 1988, her EEOC charge and federal complaint alleging pay discrimination were timely filed.

## 2. FAILURE TO PROMOTE CLAIMS

■ In *Jewett v. International Telephone & Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.) (citations omitted), *cert. denied*, 454 U.S. 969, 70 L.Ed.2d 386 (1981), we stated:

Suits may be brought by victims of one or more discriminatory acts occurring before the limitations period, so long as the plaintiff establishes that the offending practice is an ongoing one.... To prevail on a continuing violation theory, however, the plaintiff must show more than the occurrence of isolated or sporadic acts of intentional discrimination. The preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's "standard operating procedure."

Relying on *Jewett*, the district court in *Erdmann v. Board of Education Union County Regional High School District No. 1*, 541 F.Supp. 388, 393 (D.N.J.1982), *reh'g granted on other grounds*, 34 Fair Empl. Prac. Cas. (BNA) 1379 (D.N.J.1984), rejected plaintiff's contention that an alleged failure to promote constituted a continuing violation:

[P]laintiff has failed to identify for the Court any continuing discriminatory policy or practice employed by defendants which would constitute a continuing violation and allow otherwise stale claims to be litigated in this cause. Plaintiff's complaint fails even to make the prerequisite allegation of such a policy or practice.

*Erdmann* and *Jewett* were both cases in which plaintiff sought to be promoted to fill a series of specific vacancies. Here, Miller did not seek to fill a specific vacancy, but sought a promotion in job title that could have been granted at any time. Judge Becker, while on the district court, addressed a similar situation in *EEOC v. Hay Associates*, 545 F.Supp. 1064, 1082–83 (E.D.Pa.1982) (emphasis added):

Hay contends that we cannot find a continuing violation under *Jewett* because Bay has not shown that discrimination against women was Hay's "standard operating procedure." We do not read *Jewett* so narrowly. The *Jewett* court faced a situation in which promotion was based on specific vacancies, all of which had been filled more than 180 days before Martha Jewett filed her charge of discrimination. *The case before us, by contrast, involves a fundamentally different personnel structure, in which promotion was not based on specific vacancies. Bay could have been promoted at any time, including the time within 180 days of the filing of the charge. Because of this difference, Bay could prove continuing discrimination without producing systemwide evidence.* Bay has produced ample evidence that the "offending practice," i.e., intentional discrimination against her, was "an ongoing one."

We believe *Hay* represents the proper method of analyzing whether a repeated failure to promote, where promotion is not based on specific vacancies, constitutes a continuing violation. Under this formulation, Miller has sufficiently alleged a continuing violation, and her claim for failure to promote is timely.[5]

---

5. Furthermore, at the time the magistrate stayed discovery, Miller was awaiting a response to her request regarding the ages and sexes of Assistant Vice Presidents at Beneficial who were eligible for promotion to Vice President. Without this information, Miller would be hard pressed to demonstrate a policy or practice of discrimination in the selection of Vice Presidents at

## D. EQUITABLE TOLLING

In appropriate cases, statutes of limitations in employment discrimination cases may be equitably tolled. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 309 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). In this circuit, there are

> three principal, though not exclusive, situations where equitable tolling may be appropriate ... (1) [if] *the defendant has actively misled the plaintiff*, (2) if the plaintiff has "in some extraordinary way" been prevented from asserting his rights, or (3) if the plaintiff has timely asserted his rights mistakenly in the wrong forum.

*Kocian v. Getty Ref. & Mktg. Co.*, 707 F.2d 748, 753 (3d Cir.) (emphasis added), *cert. denied*, 464 U.S. 852, 104 S.Ct. 164, 78 L.Ed.2d 150 (1983). In *Meyer*, the defendant employer had misrepresented the reasons for the employee's termination. We found the misrepresentation sufficient to preclude summary judgment on limitations grounds, despite the fact that plaintiff had consulted with a lawyer when he was terminated.[6]

Equitable tolling applies " 'where the employer's own acts or omissions have lulled the plaintiff into foregoing prompt attempts to vindicate his rights.' " *Meyer*, 720 F.2d at 307 (quoting *Bonham v. Dresser Indus.*, 569 F.2d 187, 193 (3d Cir.1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978)). Furthermore, the "contention that only 'egregious acts of active deception' can toll the limitation period has no support in the law." *Id.*

[6]. Thus, the fact that Miller was herself an attorney does not preclude us from applying equitable tolling. As we noted in *Meyer*, "[w]here misrepresentation occurs tolling represents an appropriate corrective mechanism, irrespective of the fact that plaintiff sought legal advice." 720 F.2d at 309. *But see Miller v. International Tel. & Tel. Corp.*, 755 F.2d at 26 (no equitable

Here, Miller alleges that Ward repeatedly assured her that her compensation was on a par with Walsh's and that she deserved and would receive a promotion to Vice President. Even if Miller's claims were not otherwise timely, these allegations in support of equitable tolling should have precluded summary judgment on statute of limitations grounds. *See Meyer*, 720 F.2d at 309.[7]

## V. MERITS

### A. PREMATURITY

As of April 1991, when the magistrate stayed discovery pending disposition of defendants' motion to dismiss and/or for summary judgment, only Charles Walsh's deposition had been taken. The deposition of Helen Perry Reilly, secretary first to Walsh and later to Miller, was taken on July 5, 1991. Thus, none of the people at Beneficial who participated in the promotion and salary decisions at issue here had been deposed when summary judgment was granted. We believe that under the circumstances present here, the incomplete state of discovery alone should have precluded summary judgment on the merits. *See Sames v. Gable*, 732 F.2d 49, 51 (3d Cir.1984) (reversing grant of summary judgment while answers to certain discovery requests remained outstanding). As we have noted, " 'where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.' " *Id.* (quoting *Costlow v. United States*, 552 F.2d 560, 564 (3d Cir.1977)).

tolling where plaintiff was a practicing attorney and there was "no evidence that he was misled or prevented from filing a timely claim with the EEOC") (citing *Pfister v. Allied Corp.*, 539 F.Supp. 224, 227 (S.D.N.Y.1982) (noting that plaintiff's equitable tolling claim was particularly weak since he is "an experienced attorney who may be expected to know of the perils of untimely filing")).

[7]. We take no view as to whether equitable tolling applies here; we hold only that material factual disputes made summary judgment on that issue inappropriate.

Beneficial. Although such a showing is not necessary under *Hay*, the incomplete state of discovery on this issue (and others; *see* section V(A), *infra*) is yet another reason why summary judgment should not have been granted.

Defendants, citing *Mid–South Grizzlies v. National Football League,* 720 F.2d 772, 780 (3d Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984), contend that it was not error to grant summary judgment before discovery had been completed, because Miller failed to file a Rule 56(f) affidavit stating what information was sought and why it was important. *See* Fed.R.Civ.P. 56(f). However, on April 30, 1991, Magistrate Hedges entered an order, drafted by counsel for defendants, which provided in part (emphasis added):

> Nothing in this Order shall be construed as limiting plaintiff's right to respond to defendants' Motion to Dismiss and/or For Summary Judgment by filing an affidavit pursuant to Fed.R.Civ.Pro. 56(f) *or by otherwise arguing that additional discovery is necessary before the Court rules on defendants' motion.*

The clause "or by otherwise arguing ..." can reasonably be read to imply that formal Rule 56(f) affidavits would not be required.

We believe that ordinarily a party urging a court to postpone ruling on a summary judgment motion pending completion of essential discovery should file an affidavit under Fed.R.Civ.P. 56(f). *See Mid–South Grizzlies,* 720 F.2d at n. 4. Here, however, Miller could reasonably have read the magistrate's April 30, 1991 order to imply that such an affidavit would not be necessary. Particularly in light of the fact that the April 30, 1991 order was drafted by defendants, Miller should not suffer the ultimate penalty—dismissal of her action—for her reasonable interpretation of the order.

Although Miller failed to file a Rule 56(f) affidavit, she repeatedly argued in her district court briefs that consideration of Beneficial's summary judgment motion should be postponed until crucial depositions had been taken. *See, e.g.,* Supplemental Appendix at 2 n. 3:

> While the evidence adduced by plaintiff through discovery to date and presented on this motion is sufficient to withstand Beneficial's summary judgment motion, much discovery pertinent to issues raised

on the motion remains to be done. Consequently, this summary judgment motion has been filed prematurely by defendants and should be denied on that basis as well. We have not written a separate point on this argument but rather have noted those areas where discovery is incomplete at the appropriate places in this brief.

*See also id.* at 3 n. 28 ("None of those involved [in the promotion decision]—Ward, Farris, Caspersen, or Schneider—have been deposed, thus making Beneficial's motion premature."); *id.* at 4 n. 43 ("Discovery of certain statistical data is still outstanding, thus adding to the prematurity of the present motion."); *id.* at 6:

> Again, however, we note that depositions of those who knew of plaintiff's or Charles Walsh's performance and abilities, who were involved in transferring plaintiff to the Government Relations Department, or who dealt with plaintiff's requests to be made a Vice President, have not yet been taken, thus making this motion premature. In particular, the depositions of David Ward, David Farris, Finn Caspersen, Mary Ann Schneider, Lawrence Cole, and other persons who were involved in personnel actions concerning plaintiff, as well as of other persons who worked with plaintiff and Walsh, have not yet been taken.

Under these circumstances, we believe the district court should have granted the requested postponement, and his failure to do so was not a sound exercise of discretion.

### B. *DISPUTED ISSUES OF MATERIAL FACT*

#### 1. PRIMA FACIE CASE

The EPA prohibits payment of unequal wages "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). A violation of the EPA constitutes a violation of Title VII. Thus, a prima facie showing of an EPA claim is also a prima facie showing of a Title VII violation. Miller presented both testimony and documentary evidence tend-

ing to show that her responsibilities were equal to those of her predecessor, Charles Walsh.

A discrimination plaintiff establishes a prima facie case by evidence that is "sufficient to raise a presumption that unlawful discrimination has occurred." *McCorstin v. United States Steel Corp.*, 621 F.2d 749, 754 (5th Cir.1980). Here, Miller's evidence fits fairly neatly into the well-known *McDonnell–Douglas* framework. *See McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If credited by the finder of fact, Miller's evidence would indicate that: (1) she is a member of a protected class (women); (2) she sought promotion to Vice President; (3) she was qualified for the promotion (as evidenced by documents including Ward's repeated recommendations); and (4) a similarly situated male (Charles Walsh) received the promotion to Vice President.

## 2. NON–DISCRIMINATORY REASONS

Beneficial offers two justifications for the disparity in pay and title between Miller and Walsh: (1) Walsh allegedly had superior experience and qualifications; and (2) Miller allegedly did not take over all of Walsh's responsibilities and duties. In granting summary judgment, the district court relied chiefly on three factual assertions which Beneficial offered in support of these theories by way of affidavits—that Walsh received favorable reviews at Beneficial, that he had many more years of legal experience than Miller, and that, unlike Walsh, Miller "never gained Ward's respect and trust." Miller has specifically contradicted each of these assertions, both in her affidavit and by independent documentary evidence. For example, she relies on Ward's statement that:

> [Miller] joined Government Relations July 1, 1984 taking over the Associate Counsel slot occupied by Ken Raatz, but also took on many of the duties of Charlie Walsh, who was not replaced.
>
> She has performed very well, and after a few months of intensive background training, is making a real contribution.

> She is now effectively performing Walsh's functions, with many of the other functions being pushed down to the two individual's [sic] who work for her.
>
> She is presently in Grade 15 which is an Assistant Vice President slot, and should be promoted in recognition that she has taken over duties formerly performed by a Grade 17 Vice President....

As to Walsh's superior experience, Miller contends that most of Walsh's prior experience was in the insurance industry, which is only a minor part of Beneficial's business. Miller further contends that if Beneficial truly believed Walsh possessed superior experience and qualifications, they would not have asked Miller to take the place of both him and Raatz. Finally, she adduced evidence contradicting the assertion that Beneficial was satisfied with Walsh's performance in Government Relations. Miller's specific rebuttals of the facts Beneficial offered in support of its ostensibly neutral reasons for its treatment of her create a material factual dispute. Although we take no view as to the actual reasons for the disparity in pay and title between Miller and Walsh, we believe there was sufficient evidence on both sides of the question to preclude summary judgment.

## C. *MILLER'S CROSS–MOTION*

■ Miller did not brief her arguments on her cross-motion. Therefore, her claim that the district court erred in denying her motion to compel discovery and to amend her complaint might, under ordinary circumstances, be waived. *See* Rules of the Third Circuit, Rule 21(1)(A)(i) (Argument section of Brief for Appellant "shall contain the contentions of the appellant with respect to the issues presented, the reasons for each contention, with citations to the authorities, statutes and parts of the record relied on.").

Regardless of whether these issues were preserved, we believe that in light of our holding that summary judgment should not have been granted, the district court should be afforded another opportunity to address

the questions presented by Miller's cross-motion. Therefore, we will not address those issues here.

## VI. CONCLUSION

In sum, we believe the district court erred in granting summary judgment because:

1) A reasonable jury could find that Miller's claims did not accrue until she talked to Walsh in September 1988 (with respect to her equal pay claims) and until she was transferred from Government Relations in October 1988 (with respect to her failure to promote claims);

2) Miller's pay discrimination and failure to promote claims allege continuing violations, and the statute of limitations thus did not begin to run until the last act of discrimination occurred (in October 1988), making all of Miller's claims timely filed;

3) A reasonable jury could find that in light of defendants' alleged misrepresentations, Miller did not know and should not have known of the alleged pay discrimination until September 1988, and that she did not know and should not have known that she would not be promoted to Vice President until October 1988. If the jury so found, Miller's claims would be timely under equitable tolling principles.

4) Summary judgment was premature in the absence of crucial discovery; and

5) Genuine disputes of material fact should have precluded summary judgment on the merits.

For the foregoing reasons, we will reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.