

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-16-2001

# Cardenas v. Massey

Precedential or Non-Precedential:

Docket 00-5225

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Cardenas v. Massey" (2001). *2001 Decisions.* Paper 242.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/242

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 16, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5225

GERARD CARDENAS,
      Appellant

v.

JON MASSEY; JAMES REBO; ROBERT LIPSCHER;
JAMES CIANCIA; DEBORAH PORITZ;
STATE OF NEW JERSEY

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 96-cv-04077)
District Judge: Hon. Garrett E. Brown, Jr.

Argued: March 1, 2001

Before: SLOVITER, NYGAARD and ROTH, Circuit Ju dges

(Filed: October 16, 2001)

       Fredric J. Gross (Argued)
       Of Counsel: Susan E. Babb
       Noel C. Crowley
       Mount Ephraim, New Jersey 08059

        Attorneys for Appellant

John J. Farmer, Jr.
 Attorney General of New Jersey
Michael J. Haas
 Assistant Attorney General
 Of Counsel
Patrick Dealmeida
 Deputy Attorney General
 Of Counsel
George N. Cohen (Argued)
 Deputy Attorney General
 On the Brief
Trenton, New Jersey 08625

 Attorneys for Appellees

Jennifer S. Goldstein
Washington, D.C. 20507

 Attorney for EEOC

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

Plaintiff-appellant Gerard Cardenas, a Mexican-American, was hired as of January 29, 1990 as the manager of the Office Systems Unit in the Information Systems Division ("ISD") of New Jersey's Administrative Office of the Courts ("AOC") following the retirement of Joseph Ribsam. Cardenas asserts that through 1989 every manager or supervisor in the ISD was a white non-Hispanic male. Appellee James Rebo, head of the ISD, had advertised the position at pay grades G-32 and G-30. Cardenas was appointed at the G-30 level. Cardenas resigned on March 1, 1996. On August 23, 1996, he filed this suit against Jon Massey, his immediate supervisor, and Rebo (individually and in their official capacities), as well as Robert Lipscher, Director of the AOC (individually), James Ciancia (Lipscher's successor, in his official capacity), Deborah Poritz (New Jersey's Chief Justice, in her official capacity),

2

and the State of New Jersey. The complaint stated disparate pay, hostile work environment, and retaliation claims under 42 U.S.C. S 1981, 42 U.S.C. S 2000e, et seq. ("Title VII"), and the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. S 10:5-1, et seq., and a common law claim for intentional infliction of emotional distress against Massey. Essentially, the claims raised in Cardenas' 128 paragraph complaint revolve around his contention that he was hired at a lower grade level than merited by the work he was assigned, received disparate pay as a result, was not promoted as merited, was the subject of retaliation, and was subject to a hostile work environment, all as a result of his ethnicity.

After discovery, the defendants moved for summary judgment and Cardenas moved for partial summary judgment on his disparate pay claims. The District Court granted defendants' motion, except as to the LAD and S 1981 hostile work environment claims against defendant Massey, and denied Cardenas' motion by opinion dated December 2, 1999 (hereafter "Dec. 2 opinion"). The court subsequently denied Cardenas' motion for reargument by opinion dated February 2, 2000. Cardenas settled his claims against Massey, resolving the remainder of the action. He then filed a timely notice of appeal as to the remaining defendants. On appeal, the EEOC has filed an amicus curiae brief solely as to the issue of the proper application of the statute of limitations to disparate pay claims.

The District Court had jurisdiction over this action under 28 U.S.C. SS 1331, 1343, 1367. This court has appellate jurisdiction under 28 U.S.C. S 1291.

II.

Cardenas has set forth a litany of incidents from his six years employment at the AOC that he contends show discrimination, retaliation, and a hostile work environment. Our review of the grant of summary judgment is plenary. See Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 129 (3d Cir. 1991).

3

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In Anderson , the Court explained that the judge's role when adjudicating a motion for summary judgment "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In making this determination, a court is to draw all reasonable inferences in favor of the non-moving party. See Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 978 (3d Cir. 1993). In other words, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.

Cardenas' disparate pay claims stem, at least in part, from his initial hiring at the G-30 level. Cardenas contends that he performed all of the responsibilities of his predecessor, who was Chief, Office Services Systems, a G-31, and came to assume additional ones (the "PC/LAN duties"). He contends that Richard Chelenza, another mid-level ISD manager, previously had the PC/LAN duties and, as a result, Chelenza's pay grade had been raised from G-31 to G-33 at Rebo's request. He claims he resolved LAN problems caused by inadequate materials supplied to the AOC by AT&T, negotiating a deal with the company whereby it replaced over $400,000 of defective materials and yet he remained at pay level G-30, the grade he held throughout his six-year tenure at the AOC.1

_____

1. After June 1994, all AOC managers' salaries were frozen. It is not clear whether the freeze applied to promotions.

4

The District Court recognized that Cardenas asserted three legal bases for his wage discrimination claim–– S 1981, LAD, and Title VII, and that a separate limitations period applies to each. Cardenas' S 1981 claims are subject to a two-year statute of limitations. See Goodman v. Lukens Steel Co., 482 U.S. 656, 662 (1987); N.J. Stat. Ann. S 2A:14-2. A two-year statute of limitations also applies to LAD claims whose "operative facts" occurred after July 27, 1993, whereas LAD claims based on events occurring before this date are subject to a six-year statute of limitations. See Martinez v. Nat'l Broadcasting Co., 877 F. Supp. 219, 230 (D.N.J. 1994); Montells v. Haynes , 133 N.J. 282, 286, 627 A.2d 654, 655 (1993). Title VII claims must be the subject of a charge filed with the EEOC within either 180 days or 300 days of the complained-of unlawful employment practice, depending upon whether the state has an anti-discrimination law, see Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 842 (3d Cir. 1992), and a complaint must be filed in the district court within 90 days of receipt of a right-to-sue letter from the EEOC, see 42 U.S.C. S 2000e-5(f)(1). The District Court calculated that to maintain an action for disparate pay based on his pay grade under Title VII, Cardenas had to file a complaint with the EEOC on or before July 29, 19902; to maintain a S 1981 action, he had to file his complaint in the district court on or before January 29, 1992; and to maintain an action under LAD, he had to file his complaint in the district court on or before January 29, 1996.

The District Court found that because Cardenas' disparate pay claims stem from his initial pay grade classification, they accrued when he began working at the AOC on January 29, 1990, and are therefore time-barred. It rejected Cardenas' argument that each paycheck he received over the course of his AOC employment, which

_____

2. The court incorrectly believed that under Title VII Cardenas' claims had to be presented to the EEOC within 180 days of the alleged unlawful employment practice. In fact, because New Jersey has an anti-discrimination law, a claim must be presented to the EEOC within 300 days of the alleged unlawful employment practice. See 42 U.S.C. S 2000e-5(e)(1), construed in Seredinski v. Clifton Precision Prods., 776 F.2d 56, 61-62 (3d Cir. 1985).

ended on March 1, 1996, constituted a separate discriminatory act that brought his claims within the statutes of limitations pursuant to the continuing violations doctrine. See Miller, 977 F.2d at 842 ("[I]f the alleged discriminatory conduct is a `continuing violation,' the statute of limitations begins to run on the date of the last occurrence of discrimination, rather than the first."). Citing, inter alia, Lorance v. AT&T Techs., Inc., 490 U.S. 900 (1989), rev'd by the Civil Rights Act of 1991, S 112, Delaware State Coll. v. Ricks, 449 U.S. 250, 257 (1980), and United Airlines, Inc. v. Evans, 431 U.S. 553, 560 (1977), the court found the continuing violations doctrine inapplicable because Cardenas described his pay checks as "consequences" of his pay grade and did not allege the AOC's pay-grade structure was facially discriminatory.

We believe that is too narrow a reading of the facts and the law. In Evans, the discrimination, which was forcing plaintiff to resign when she married, occurred outside the statutory period. Although she was rehired within the statutory period, her seniority was calculated from the date of her re-hire. The Supreme Court rejected plaintiff 's argument that this application of the seniority system constituted a continuing violation because it gave present effect to the employer's past discriminatory act by disregarding the seniority she had accrued before her forced resignation. The Court held that no present violation existed because the seniority system, its adoption, and its operation were nondiscriminatory. See Evans, 431 U.S. at 557-60.

In Ricks, the employer College denied the plaintiff professor tenure and gave him a "terminal" one-year contract pursuant to College policy. The tenure denial was outside the statutory period, but plaintiff 's final day of employment was not, and he argued that his discharge was a continuing violation. The Court disagreed, finding that it was "a delayed, but inevitable, consequence of the denial of tenure. In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had

6

been denied tenure." Ricks, 449 U.S. at 257-58. The Court cited Evans for the proposition that we look not for continuing effects but for present acts of discrimination. Id.

In Lorance, the plaintiffs were demoted under a facially neutral seniority system, operated in a non-discriminatory manner but allegedly adopted with a discriminatory purpose outside the statutory period. The Court, citing Evans, Ricks, and the special status of seniority systems in discrimination law, Lorance, 490 U.S. at 911-12, declined to apply the continuing violations doctrine, holding that "[b]ecause the claimed invalidity of the . . . seniority system is wholly dependent on the alleged illegality of signing the underlying [collective bargaining] agreement, it is the date of that signing which governs the limitations period." Id. at 911.

In all three cases, the Supreme Court held there was no continuing violation where the effects of prior discriminatory acts, but no actual discrimination, occurred within the limitations period. The Evans-Ricks-Lorance line of cases bars claims where the relevant aspect of the employment system (such as promotion, seniority, or termination) is facially neutral, and any discrete discriminatory conduct took place and ceased outside the period of limitations. As the Lorance Court observed, "[w]ith a facially neutral system the discriminatory act occurs only at the time of adoption, for each application is nondiscriminatory." Id. at 912 n.5. However, this line of cases does not bar claims based on conduct which is alleged to have "continued to discriminate unlawfully each time it was applied." Anderson v. Zubieta, 180 F.3d 329, 336 (D.C. Cir. 1999).

Here, Cardenas alleges the decision not to promote him, or increase his wage level to one appropriate to his skills, was made on an ongoing basis. The facially-neutral-system analysis of Evans, Ricks, and Lorance is thus inapposite. A more pertinent Supreme Court decision is Bazemore v. Friday, 478 U.S. 385 (1986), where the Court reversed the dismissal of a Title VII disparate pay claim on statute of limitations grounds and held that each of plaintiffs' pay checks constituted a distinct violation of their right to nondiscriminatory compensation. The Court stated that the

7

limitations defense could not be based on the ground that the disparities stemmed from discriminatory policies pre-dating the effective date of Title VII, explaining:

> that the [employer] discriminated with respect to salaries prior to the time it was covered by Title VII does not excuse perpetuating that discrimination after [it] became covered by Title VII. . . . A pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute. . . . Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII.

Bazemore, 478 U.S. at 395-96 (third emphasis added) (Brennan, J., concurring in part, joined by all members of the Court).

Thereafter, in Miller v. Beneficial Management Corp., 977 F.2d 834 (3d Cir. 1992), a case brought under the Equal Pay Act rather than Title VII, this court came to a similar conclusion. We held that the statute of limitations for an EPA claim began to run on the date the plaintiff received her last allegedly discriminatory paycheck. In fact,"[m]ost courts appear to treat pay discrimination claims as continuing violations." Miller, 977 F.2d at 843. Certainly, in this circuit, " `discriminatory wage payments constitute a continuing violation. . . . To hold otherwise would permit perpetual wage discrimination by an employer whose violation . . . had already lasted without attack for [longer than the limitations period].' " Id.  (quoting Hodgson v. Behrens Drug Co., 475 F.2d 1041, 1050 (5th Cir. 1973)).

The EEOC filed its brief as amicus curiae in this case because of its view that the District Court erroneously applied the statute of limitations to Cardenas' Title VII claim. The EEOC states that "both Bazemore  and Miller contemplate that an individual may challenge allegedly discriminatory wage payments so long as one such payment falls within the limitations period." Br. of EEOC at

8

14. It further states that "Cardenas received allegedly discriminatory paychecks within 300 days prior to the filing of his administrative charge, and so his claim should have been deemed timely." Id. at 10. The EEOC argues that if the District Court's opinion is allowed to stand, it "would frustrate enforcement of Title VII by improperly insulating current discriminatory conduct from challenge under the statute." Id. at 1.

In its opinion on Cardenas' request for reargument, the District Court rejected Cardenas' argument that it had overlooked the Miller decision. The court first noted that Cardenas had not cited Miller and then held that Miller was not controlling because it analyzed the statute of limitations under the Equal Pay Act whereas Cardenas sued under Title VII. However, the Supreme Court's opinion in Bazemore concerns a Title VII claim. Moreover, application of the continuing violations doctrine is not dependent on which statute gives rise to the plaintiff 's claim. See Brinkley–Obu v. Hughes Training, Inc., 36 F.3d 336, 345–51 (4th Cir. 1994) (applying continuing violation theory to both Title VII and EPA disparate pay claims). Although Miller may have been brought under a different statute, its holding is still applicable here. Cf. Miller, 977 F.2d at 843 (relying in part on Hall v. Ledex, Inc., 669 F.2d 397 (6th Cir. 1982) (Title VII and EPA) and Satz v. I.T.T. Fin. Corp., 619 F.2d 738 (8th Cir. 1990) (Title VII)). Finally, there are numerous cases in other circuits that have followed the Bazemore decision to hold that in a Title VII case claiming discriminatory pay, the receipt of each paycheck is a continuing violation. See, e.g., Anderson v. Zubieta, 180 F.3d 329, 335–37 (D.C. Cir. 1999); Ashley v. Boyle's Famous Corned Beef Co., 66 F.3d 164, 167–68 (8th Cir. 1995) (en banc); Brinkley–Obu, 36 F.3d at 345–51.

The defendants seek to uphold the summary judgment on the disparate pay claim on the ground that the undisputed facts show that any difference in pay between the employees in the ISD unit who also had the title of project manager "was a result of the varying degrees of seniority, experience, education and difference in job responsibilities." Br. of Appellees at 19. It may, indeed, be true that whatever differences existed were the result of

9

factors other than ethnicity and that the failure to promote Cardenas to a level that he claims would have been consistent with his responsibilities may have been due to his failure to request and/or merit promotion. However, because the District Court disposed of the disparate pay claim on the basis of the statute of limitations rather than any merits factor, we cannot reach those issues but will leave them to the District Court on remand.3

For the reasons set forth above, we will reverse the District Court's order granting summary judgment for defendants on Cardenas' disparate pay claims and remand the case for a determination on the merits.

IV.

Cardenas contends he became subject to a hostile work environment after Jon Massey became his immediate supervisor on March 7, 1991 pursuant to an ISD reorganization. According to Cardenas, Massey subjected him to ethnic slurs and comments, beginning with their initial interview and continuing through 1994. Among other things, Massey allegedly called Cardenas the "boy from the barrio," app. at 1185, asked Cardenas why he had anglicized his name, and regularly dealt with professional disagreements by questioning whether Cardenas intended to pull out a switchblade. Until 1993, Cardenas also found derogatory anonymous messages on the marker board in his cubicle, which he believes Massey wrote. The most offensive message used the word "mojado," which means "wetback." App. at 895, 1189.

He further contends that Massey discriminated against him in completing performance evaluations.4 Regarding

_____

3. Nor do we decide whether the initial decision to hire Cardenas at a level 30 was due to ethnicity or, as defendants argue, the policy or practice not to hire any new hire at level 32. We will give the District Court the opportunity to decide in the first instance whether it is a separate claim or survives the statute of limitations bar because it is inextricably bound to the disparate pay claim.

4. The AOC performance evaluations consist of ten component ratings and an overall rating. The component categories are: (1) knowledge of

Massey's disparate performance evaluations, Cardenas has provided evidence that appears to show that Massey regularly rounded up the component ratings when determining the overall scores of non Hispanic subordinates but rounded down when calculating ratings of Cardenas, sometimes to the point of rating Cardenas lower overall than white employees with lower component ratings. 5 Cardenas contends that Rebo also discriminated against him, though more subtly than Massey. For example, he points out that Rebo assigned minorities and trainees disproportionately to his unit and claims that Rebo tarnished his reputation by spreading the word that he was an affirmative-action hire. He further notes that Rebo reviewed each of Massey's performance evaluations (of Cardenas and of Massey's other subordinates) before they were issued, and had the authority to change the ratings. App. at 971–73.

Finally, Cardenas asserts Rebo and Massey collectively impeded his job performance through other facially neutral management devices, such as knowingly contradictory instructions and assignments incompatible with his staff resources. He claims that Massey insisted Cardenas obey him even when he contradicted Rebo and did not defend

_____

work, (2) attendance history, (3) quantity of work, (4) quality of work, (5) planning and organization, (6) initiative, (7) mental ability, (8) analytical ability and judgment, (9) leadership, and (10) development of personnel. The evaluator gives the employee one of five rankings (unsatisfactory, marginal, satisfactory, commendable, and outstanding/superior) for each category and an overall rating. See, e.g., App. at 206–13.

5. Cardenas assigned each rating a number, from 0 to 4, then calculated his "GPA" from the ratings in the component categories, which he then compared to the overall ratings. Massey gave Cardenas an overall rating of "satisfactory" or "2" for GPAs of 2.5, 2.4, and 2.6, and an overall rating of "marginal" or "1" for a GPA of 1.7. App. at 474–505. By contrast, Massey gave other subordinates overall ratings of "commendable" or "3" for GPAs of 2.4, 2.55, 2.6, and 2.6, and a "satisfactory +" or "2.5" for a GPA of 2.2. App. at 896–935. Notably, Cardenas himself received an overall rating of "commendable" or "3" for a GPA of 2.6 in an evaluation he received from his previous supervisor. App. at 216–23. We express no opinion on the accuracy of Cardenas' rating system, an issue for the trier of fact.

11

Cardenas when his express directives got Cardenas into trouble.

Cardenas claims that he complained to Massey, Rebo, Lipscher, Bobby Battle (the AOC's Equal Employment Opportunity ("EEO") Officer), and Human Resources personnel about Massey's harassment to no avail. He asserts that Battle refused to address the problem informally and that the harassment continued unabated until Cardenas submitted a formal complaint on December 30, 1994, which he had been reluctant to do for fear of retaliation. Defendants emphasize that Cardenas made no allegations of specific discrimination to anyone in the AOC until the summer of 1994, and that many of his complaints were non-specific or accompanied by requests that the particular incident be treated as minor or that he be left to deal with the problem on his own to avoid reprisals.

The failure to complain to higher management did not defeat plaintiffs' Title VII claims in Faragher v. Boca Raton, 524 U.S. 775, 782 (1998), or Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 748-49 (1998), and we see no reason why the failure to file a formal complaint would defeat Cardenas' claim here. As noted, he did subsequently file a complaint pursuant to the AOC procedures. Thus, at most, if Cardenas sent a mixed message, it would be an issue going to his credibility as to the severity of the harassment.

Cardenas did not complete providing detailed allegations for his EEO complaint until March 1995. On March 3, 1995, the AOC rejected his request that he and his entire unit be transferred out of the ISD immediately, but offered him three temporary alternative work assignments for the pendency of the EEO investigation. Cardenas asserts that the options were unacceptable because they either left him under Rebo's or Massey's supervision or demoted him by removing his management responsibilities. Moreover, Cardenas claims that when he nonetheless professed interest in one option, his efforts to accept it were stonewalled. On April 6, 1995, he filed a charge with the EEOC.

Cardenas contends that the internal EEO investigation was overly long, pointing out that the investigators did not

12

send charges to Rebo and Massey until June 1995, and then granted their request for an extension to respond. The EEO did not issue a report until October 30, 1995. Cardenas received a copy of the report in November 1995. He argues that the report's conclusion finding "no evidence of discrimination," App. at 285, is unfounded. He also notes that the investigation did not address his disparate pay claim.

Cardenas has also asserted a claim of retaliation which he attributes to his engaging in three protected activities in 1994 and 1995 known to Massey and Rebo. He supported a subordinate's sexual harassment allegations against Rebo in June 1994, filed a formal discrimination complaint against Massey and Rebo with the AOC's EEO that December, and offered to support a lateral job applicant's EEO complaint against Massey in January 1995. Cardenas claims to have suffered retaliation from Rebo and Massey for his protected activities. He cites, for example, an allegedly undeservedly low performance evaluation in August 1994, a threat of discipline which sent him to the hospital with stress-induced chest pains, increased personnel disruptions in his unit, and an unusual summons to the human resources department which provoked a second stress attack severe enough to warrant a second hospital visit.

In November 1995, allegedly realizing he could not salvage his job, Cardenas began looking for new employment. He left the AOC on March 1, 1996, and received his "right-to-sue" letter from the EEOC on May 28, 1996.

A hostile work environment, first recognized by the Supreme Court as a basis for a discrimination claim under Title VII in Meritor Savings Bank, FSB v. Vinsen , 477 U.S. 57, 65-68 (1986), in a case claiming sexual harassment, is now established as a basis for various discrimination claims. See Faragher v. Boca Raton, 524 U.S. 775, 786-87 (1998) (discussing the Court's "repeated" clarifications of the foundations of hostile work environment claims). In order to establish a hostile work environment claim under Title VII, Cardenas must show that (1) he suffered intentional discrimination because of his national origin; (2)

the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996).

In considering whether Cardenas has established the elements of a hostile work environment claim, the record must be evaluated as a whole to decide whether the plaintiff has proved his or her case, because "[p]articularly in the discrimination area, it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. . . . [A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999) (quotations omitted); see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) ("Whether an environment is `hostile' . . . can be determined only by looking at all the circumstances."). Title VII applies to both "facially neutral mistreatment . . .[and] overt [ethnic] discrimination . . . [which] in sum constitute[ ] the hostile work environment." Id. at 148; 6 see also Aman, 85 F.3d at 1081–84 (discussing the increased sophistication of modern violators, the obligation of courts to be "increasingly vigilant" against subtle forms of discrimination, and the importance of allowing plaintiffs to prove discrimination indirectly: "[i]n light of the suspicious remarks [arguably racial slurs] . . . , a reasonable jury could interpret [facially neutral] behavior[such as stolen time cards] as part of a complex tapestry of discrimination").

The District Court accepted that Massey's alleged remarks and the anonymous marker-board messages satisfied the causation element of the hostile work

_____

6. We draw here on standards developed in sexual harassment cases. As the Supreme Court observed in Faragher,"[a]lthough racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment." Faragher, 524 U.S. at 787 (1998).

14

environment claims but noted that "some of the other allegedly hostile actions taken by the [appellees] were not overtly ethnically based." Dec. 2 opinion at 20. However, reviewing the totality of defendants' alleged discriminatory conduct as required by Durham, the District Court concluded that Cardenas' "only factual allegations . . . that arguably can be considered severe and pervasive instances of ethnically hostile conduct are [his] claims regarding Massey's disparaging comments about [Cardenas'] ethnicity." Id. at 24. The court held that assigning minority workers to a minority manager's unit does not create a hostile environment, found that Cardenas "failed to come forward with any evidence . . . indicat[ing] racial hostility infected the [performance] evaluation process," id. at 23, and found no evidence that Massey and Rebo set Cardenas up to fail. Although the District Court agreed that Cardenas had presented evidence of ethnic animus on Massey's part, the court stated that "a plaintiff cannot prove a case of ethnic discrimination merely by . . . raising the specter of discrimination over otherwise legitimate management decisions that may have negatively impacted a minority employee." Id. at 24.

We cannot say that the District Court's evaluation of the evidence was not a reasonable one for a trier of fact to reach. However, the District Court declined to examine the possibility that defendants' "management decisions" masked discriminatory intent. As this court has previously emphasized, the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim. See Durham, 166 F.3d at 148–49; Aman, 85 F.3d at 1081–84.

In addition to the oral and written ethnic slurs cited by the District Court, Cardenas has provided evidence from which a jury might find ethnic animus underlying other ostensibly nondiscriminatory incidents. For example, disproportionate assignment of minority employees to the only unit supervised by a minority manager might create an impression of, or be motivated by an intent to achieve,

15

segregation. Likewise, consistently lower performance evaluations for a protected class member as compared to non-protected co-workers may indicate discriminatory intent.7

Defendants contest the manner in which Cardenas has made numerical equivalents, but Cardenas' figures create an inference strong enough that we cannot disregard the evidence for purposes of summary judgment. The AOC's evaluation process is subjective and a jury could conclude that Massey, who allegedly subjected Cardenas to ethnically-charged comments, was motivated by ethnic animus in giving Cardenas lower overall ratings than white employees when Cardenas had higher component ratings. Similarly, a jury could find that Rebo might reasonably have been expected to notice and address this suspect pattern.

Finally, Cardenas has provided evidence from which a jury could conclude that Rebo and Massey set him up to fail. Cf. Harris, 510 U.S. at 23 (one of many factors which may indicate hostile work environment is "whether it unreasonably interferes with an employee's work performance.").8 For example, Cardenas testified at his

_____

7. One commentator has written of the effect of similar conduct in sexual harassment situations. See Vicki Schultz, Reconceptualizing Sexual Harassment, 107 Yale L.J. 1687 (1998) cited with approval in Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir. 1999) (observing that some prevalent forms of sexual harassment include "denigrating [victims'] performance . . . , providing sexist evaluations of [victims'] performance or denying them deserved promotions, . .. denying [victims] the perks or privileges that are required for success, . . . [and] engaging
in taunting, pranks, and other forms of hazing designed to remind [victims] that they are different and out of place.").

8. "To render visible many of the . . . forms of harassment that remain hidden, we should also recognize that much of the behavior that creates a hostile working environment is conduct that has the purpose or effect of undermining the perceived or actual competence of [the victim of discrimination]." Schultz, supra note 7, at 1762. Indeed, "there are diverse ways of subverting a [victim's] perceived or actual competence. Sometimes it takes the form of deliberate sabotage of a [victim's] work performance, such as . . . simply assigning her tasks that are impossible to accomplish." Id. at 1764. (internal citations omitted).

16

deposition regarding an incident where, pursuant to Massey's orders, he curtailed the scope of a presentation requested by Rebo, and was publicly berated by Rebo as a result. App. at 1017-18. If true, this may be analogous to incidents referred to in Durham which were included as constituting a hostile workplace. 166 F.3d at 145-46. He also claims that he was given assignments too complicated for his unit, which had a disproportionately high number of trainees, to complete successfully. See id.

The District Court determined that a jury could conclude that Cardenas' allegations regarding the ethnically harassing comments by Massey were severe and pervasive enough and would offend a reasonable person, satisfying the elements of the hostile work environment claim as to Massey. Feb. 2 op. at 25. However, it found "a paucity of credible evidence" showing that the other defendants acted in a discriminatory manner based on Cardenas' ethnicity. Id. at 24. Although Cardenas may not have presented as much evidence as did plaintiffs in other hostile workplace environment cases, we cannot conclude that he has not presented enough evidence to make a genuine issue of material fact. We believe that a jury could determine that this hostile work environment stemmed from several forms of facially neutral mistreatment as well as from Massey's facially discriminatory comments.

We have no reason to believe the result would be any different under the LAD. To establish a hostile work environment claim under the LAD, a plaintiff "must demonstrate that the defendant's conduct (1) would not have occurred but for the employee's [national origin]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [person of the same protected class] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Taylor v. Metzger, 152 N.J. 490, 498, 706 A.2d 685, 688-89 (1998) (quotations omitted). The elements of this claim closely resemble the first four elements of the Title VII hostile work environment claim. Moreover, like this court, the New Jersey Supreme Court requires a cumulative analysis of the incidents comprising an alleged hostile work environment. See Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 607, 626

17

A.2d 445, 455 (1993). Therefore, our discussion of the Title VII claim above applies with equal force to this claim's basic elements. We conclude that Cardenas has provided sufficient evidence of an actionable hostile work environment under the LAD to survive summary judgment.

Cardenas also claims retaliation as another basis for liability. The District Court recognized that to establish a prima facie retaliation claim under Title VII, S 1981, or the LAD, Cardenas must show: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. Dec. 2 opinion at 38; see Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997) (Title VII); Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 198 (3d Cir. 1996) (LAD); Khair v. Campbell Soup Co., 893 F. Supp. 316, 335 (D.N.J. 1995) (S 1981).

The District Court granted summary judgment for defendants on Cardenas' retaliation claims, finding that Cardenas had not shown that he engaged in a protected activity or, assuming Cardenas suffered an adverse employment action, any causal relationship between that activity and the actions that were allegedly retaliatory. Dec. 2 op. at 39. We are satisfied that Cardenas has pointed to evidence that he engaged in three protected activities between June 1994 and January 1995 in the form of his own discrimination complaint and his cooperation in the complaints of two other individuals.

In Robinson, we stated that an adverse employment action is one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." See 120 F.3d at 1300. Cardenas claims that his resignation was a constructive discharge, which we will assume arguendo would constitute an adverse employment action. "In order to establish a constructive discharge, a plaintiff must show that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Aman, 85 F.3d at 1084 (quotations omitted). A "continuous pattern of discriminatory treatment over a period of years" may

18

constitute "intolerable" conditions even without a particular egregious precipitating incident. Id. ("The fact that Aman had been subject to continuous discrimination during her employment could support a conclusion that she simply had had enough. No other precipitating facts were legally required.").

The District Court was willing to assume for purposes of summary judgment that Cardenas suffered a constructive discharge but found missing evidence of any causal link to any of the alleged protected activity. As to the poor performance evaluation, which Cardenas also cites here as retaliatory, the District Court concluded that Cardenas failed to show that the improper performance evaluation was causally related to Cardenas' engaging in any protected activity. Dec. 2 opinion at 40.

We are, of course, cognizant of our obligation to view the record and submissions of the parties so that we may draw all reasonable inferences in favor of the non-moving party. As is evident from the foregoing, we have been able to find enough evidence to show the existence of a genuine issue of material fact as to the existence of a hostile work environment. We have been unable to find any such issue with respect to the required causal element in Cardenas' retaliation claim. He contends that the evaluation that rated the work he performed through August 1995 as "marginal," the lowest he ever received, was not presented to him until after the completion of the EEO report. There have been cases in which the temporal relation between an adverse employment action and the protected activity has enabled the court to draw the inference of causal relationship. See, e.g., Jalil v. Advel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (inferring causation when discharge occurred two days after employer's notice of plaintiff 's EEOC complaint). However, "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not `unusually suggestive.' " Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)). The temporal relationship in this case is, alone, insufficient to establish causation, because the alleged protected activity

19

took place over a substantial period of time and any routine employment action taken during that period would necessarily be related temporally. In such circumstances, there would have to be another basis to permit the inference of a causal relationship.

Although we have held that many of the employment actions to which Cardenas points as retaliatory were part of the fabric of incidents from which a factfinder could conclude made for a hostile work environment, it was Massey's overt ethnic hostility that formed the thread between the employment actions and the alleged hostile environment. There is no similar basis to form a thread between the same otherwise routine employment actions and the protected activity. Our finding such a thread would be sheer speculation. Under that circumstance, we will affirm the judgment of the District Court granting defendants summary judgment on Cardenas' retaliation claim.

V.

Having determined that the District Court's dismissal of Cardenas' claim for disparate pay on the basis of the statute of limitations was erroneous as a matter of law and that its grant of summary judgment for the defendants on liability for a hostile workplace cannot be sustained, we must decide which claim survives as to which defendant. Inasmuch as Cardenas settled with Massey, the defendant with the most direct culpability, we consider only the claims against the other defendants.

The District Court, having dismissed the disparate pay claims, never considered which defendants would be liable if Cardenas were to prevail on the merits of that claim. Dec. 2 opinion at 17. We believe it appropriate for the District Court to consider that issue in the first instance. We therefore limit our consideration to the question of liability on the hostile work environment claim. Of course, if Cardenas does not prevail, there would be no reason to consider relief as to any of the defendants. Nonetheless, we proceed to consider whether there are other grounds to affirm the District Court's dismissals as to each defendant at this stage.

20

Cardenas seeks only equitable relief from Chief Justice Poritz and Ciancia. He seeks an injunction requiring them to implement specific anti-discrimination policies at the AOC and alter his employment records retroactively to reflect, contrary to fact, a higher pay-grade classification and more favorable performance evaluations. In support of his position, Cardenas cites authority for the proposition that Title VII, S 1981, and the LAD all provide for equitable relief, see 42 U.S.C. S 2000e-5(g)(1) (Title VII); Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975) (S 1981); Shaner v. Horizon Bancorp., 116 N.J. 433, 441, 561 A.2d 1130 (1989) (LAD), and contends that he "cannot obtain the whole remedy that Title VII specifically promises and that is implicit in S 1981 and the LAD" without the equitable relief he seeks, Br. for Appellant at 62.

Because Cardenas is no longer employed by the AOC, he will not be affected by its implementation of, or failure to implement, new anti-discrimination policies. Therefore, a change in AOC anti-discrimination policies will not make him "whole" or remedy violations he contends the defendants committed.9 Regarding Cardenas' novel request for an injunction requiring the AOC to alter his performance evaluations and pay-grade classification to reflect not what they actually were but what they would have been without discrimination, he has presented no precedent, nor have we found one, granting equitable relief which would require a public agency to complete its records counterfactually. We therefore affirm the District Court's grant of summary judgment to Ciancia and Poritz regarding Cardenas' claim for equitable relief.

We consider next whether there is any basis on which Cardenas could maintain his claims for a hostile work environment against the state of New Jersey. The Supreme Court recently reviewed the standard for Title VII employer

_____

9. To the extent he seeks relief for perceived ongoing discrimination at the AOC against current employees, he has presented no evidence of such discrimination and cannot in any case assert the rights of the employees. See O'Malley v. Brierley, 477 F.2d 785, 789 (3d Cir. 1973) (citing "the principle that one cannot sue for the deprivation of another's
civil rights") (quotations omitted).

liability in the context of sexual harassment and clarified that agency principles apply. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). An employer is liable for acts committed by its employees in the scope of their employment, which may include some types of disparate treatment of employees by supervisors, such as discriminatory reprimands or job assignments. See Faragher, 524 U.S. at 798–99. Pure harassment (e.g., ethnic slurs) is not within the scope of employment and the Court suggested that hostile work environment cases will most often properly be analyzed under the rubric of either employer negligence or vicarious liability. See id. at 802–07; Ellerth, 524 U.S. at 757–59.

The Court held that employers are subject to vicarious liability under Title VII for hostile work environments created by supervisory employees. However, it also enunciated an affirmative defense limiting this liability when the plaintiff has not suffered a tangible adverse employment action. The defense depends on the reasonableness of both the employer's and the plaintiff 's preventative and remedial measures. Specifically, the Court held:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

22

Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807-08.

In this case, the District Court held that although Cardenas had made a prima facie case showing a hostile work environment based on Massey's ethnically disparaging comments, the undisputed evidence "shows that the defendants took reasonable steps to prevent harassment in the workplace, and the plaintiff failed to avail himself of the AOC's complaint procedure until December, 1994." Dec. 2 opinion at 34. The court continued, "[o]nce the plaintiff did file a complaint, the undisputed evidence shows that the AOC took immediate, albeit temporary, remedial measures while it conducted an investigation, and the harassment stopped." Id.

Cardenas does not have to prove at this stage that New Jersey is liable for a hostile work environment. Instead, he need merely show that there is a genuine issue of material fact that it may be held liable for employer liability. If Cardenas does prove the existence of a hostile work environment, New Jersey will be liable if (1) Cardenas shows that Massey's overt harassment or Rebo's more subtle approach led to a tangible employment action or (2) one of the two bases for an Ellerth/Faragher affirmative defense as to employer supervisory liability is not available. Cardenas argues that his resignation from the AOC was in fact a constructive discharge which would constitute a tangible employment action and preclude New Jersey from using the Ellerth/Faragher defense. 10 If Cardenas convinces

_____

10. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. There appears to be some disagreement on whether constructive discharge constitutes a tangible employment action. Compare Caridad v. Metro North Commuter R.R., 191 F.3d 283, 294 (2d Cir. 1999) (stating "constructive discharge does not constitute a`tangible employment action' as that term is used in Ellerth and Faragher.") with Durham Life Ins. Co. v. Evans, 166 F.3d 139, 153 (3d Cir. 1999) (observing "[u]nder [plaintiff]'s theory, any substantial adverse action . . . would not be a tangible adverse employment action if it led the affected employee to quit before the demotion took effect. This is contrary to Title VII doctrine, which recognizes a constructive discharge under such circumstances.")

23

a jury that he was victimized by a hostile work environment created by Massey or Rebo, it is certainly possible that the same jury would find that the hostile environment was severe enough to have precipitated Cardenas' resignation, i.e., a constructive discharge. We have found that Cardenas presented sufficient evidence to create a question of fact on the existence of a hostile work environment. It follows that he presented enough to survive summary judgment on the constructive discharge issue, and hence New Jersey's employer liability.

Even if the alleged hostile work environment had not culminated in a tangible employment action, summary judgment for New Jersey based on the Ellerth/Faragher defense, which the District Court found dispositive, would be premature. There are factual issues outstanding as to the reasonableness of the parties' respective actions. As the District Court pointed out, Cardenas did delay before filing a formal EEO complaint and did refuse the alternative positions the AOC offered him. On the other hand, he had complained informally to Rebo, Massey, and Battle, the EEO Officer, and Battle refused to address Cardenas' concerns without a formal complaint. In these circumstances, Cardenas' reluctance to file a formal complaint for fear of aggravating the situation or branding himself a troublemaker might not have been unreasonable.

Cardenas argues that the AOC's published anti-discrimination policy and complaint procedure, on which the District Court relied, was insufficient to satisfy Ellerth/Faragher for a number of reasons. Cardenas asserts that the investigators declined to re-interview him when he insisted that his lawyer be present but instead adopted Massey's explanation of the alleged ethnic slurs; the report was issued seven months after he submitted his detailed

_____

and Cherry v. Menard Inc., 101 F.Supp.2d 1160, 1171 (W.D. Iowa 2000) ("This court, however, does not agree with the decisions reached in Caridad.").

We leave this issue to the District Court in the first instance. For purposes of this discussion, we assume a constructive discharge is a tangible employment action.

24

discrimination allegations (ten months after his initial, formal complaint) and during that period he remained under the supervision of Massey and Rebo, allegedly subject to continuing discrimination; the AOC allegedly did not respond to his e-mail asking for protection against ongoing retaliation; the alternative positions offered to Cardenas pending the investigation purportedly either left him under the supervision of Rebo or Massey or effectively demoted him by eliminating or significantly decreasing his managerial duties, and his effort to find out more about, and possibly accept, one of the positions was stonewalled; and the internal investigation failed to address his disparate pay claim and concluded that there was no discrimination and therefore offered him no relief. Inasmuch as we cannot rule out a genuine issue of material fact with respect to whether the Ellerth/Faragher affirmative defense would be available to New Jersey, we cannot sustain the grant of summary judgment on the Title VII claim as to New Jersey.

Similarly, New Jersey may be liable under its own LAD. Under New Jersey's LAD, employers are liable under traditional agency principles. See, e.g., Rudolph v. Adamar of N.J., Inc., 2001 U.S. Dist. LEXIS 10902, *39 (D.N.J. July 31, 2001) ("Suits brought against the State as an employer are clearly within the scope of the explicit waiver of sovereign immunity contained in [the LAD]"); Newsome v. Administrative Office of Courts, 103 F.Supp.2d 807, 821 (D.N.J. 2000) ("As with Title VII, under the LAD, traditional agency principles govern the extent to which the[employer] may be liable for compensatory damages for [a supervisor's] actions. When a supervisor . . . , acting within the scope of his employment, harasses an employee under his supervision, the employer is vicariously liable.").

It remains to consider whether there is a basis also to retain as defendants the two remaining named individuals, Rebo and Lipscher. Although claims against individual supervisors are not permitted under Title VII, see, e.g., Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996) (en banc), this court has found individual liability under S 1981 "when [the defendants] intentionally cause an infringement of rights

25

protected by Section 1981, regardless of whether the [employer] may also be held liable." See Al-Khazraji v. Saint Francis Coll., 784 F.2d 505, 518 (3d Cir. 1986); see also Santiago v. City of Vineland, 107 F.Supp.2d 512, 540-41 (D.N.J. 2000). In Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989), the Supreme Court held S 1983 provides the " `exclusive federal damages remedy for the violation of the rights guaranteed by S 1981 when the claim is pressed against a state actor.' " Following Jett , Congress passed the Civil Rights Act of 1991 which amended S 1981 to provide that "rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law." 42 U.S.C. S 1981(c)(1994). As a district court has noted, "[f]ederal courts have disagreed whether S 1981(c) abrogates Jett by creating an implied independent cause of action." Meachum v. Temple Univ., 42 F.Supp.2d 533, 541 n.9. (E.D. Pa. 1999); see also Jones v. School Dist., 198 F.3d 403, 414-15 (3d Cir. 1999); Santiago, 107 F.Supp.2d at 540 n.17 (D.N.J. 2000) (suggesting it is an open question in this circuit whether S 1981 claims are available against state actors).

Under the LAD a supervisory employee may be liable for discrimination for aiding and abetting another's (the employer's) violation. See Hurley, 174 F.3d at 126; see also Failla v. City of Passaic, 146 F.3d 149, 158 (3d Cir. 1998) ("[A] person is liable for harm resulting to a third person from the conduct of another when he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.") (quotation omitted). Moreover, a supervisor has a duty under New Jersey law to act against harassment, and a supervisor's violation of this duty by either deliberate indifference or affirmative harassment subjects the supervisor to LAD liability. Hurley , 174 F.3d at 128 (citing New Jersey cases); see also id. at 126 (failure to act may qualify as aiding and abetting when it rises to the level of "substantial assistance or encouragement.") (quotation omitted).

We need not reach that issue as to Lipscher because the only evidence implicating Lipscher in discriminatory activities is his ultimate responsibility for the investigation

26

as the AOC Director. There is no evidence suggesting that he was aware of, but ignored, Cardenas' cries for help or defects in the investigation. There is no evidence that Lipscher discriminated against Cardenas or was deliberately indifferent to the discrimination he suffered. The evidence indicates that Lipscher had little contact with Cardenas and that he did not make the type of daily managerial decisions Cardenas claims masked Massey's and Rebo's discriminatory intent. There is no evidence that Lipscher had any reason to believe Cardenas' direct supervisors were breaching their duty not to discriminate. Lipscher's acceptance of the investigator's report, which Cardenas characterizes as a "whitewash" and which excused Massey's derogatory comments (or purported to explain why they were not derogatory), does not create a genuine issue as to his discriminatory intent. Cardenas has not presented any evidence that Lipscher had reason to believe the report was inaccurate, incomplete, or in bad faith. No reasonable jury could find that Lipscher aided or abetted any discrimination against Cardenas. The evidence shows that Lipscher took Cardenas' complaint seriously, assigned an investigator to the case, and accepted the investigator's report. We agree with the District Court that a reasonable jury could not find any basis for liability as to Lipscher, either individually or in his official capacity.

Retention of Rebo is, of course, a different matter. The majority of the behavior which Cardenas found offensive was perpetrated by either Rebo or Massey. Whether Rebo was involved in, or deliberately indifferent to, many of the allegedly discriminatory actions contributing to the claimed hostile work environment is an issue of fact. For example, Rebo was allegedly aware of some of Massey's comments and conflicting directives to Cardenas but failed to prevent them. He also controlled personnel assignments resulting in disproportionate numbers of both minorities and trainees in Cardenas' unit, and somehow the fact that Rebo had selected Cardenas in part based on his ethnicity became common knowledge in ISD. Moreover, Rebo failed to recommend Cardenas' reclassification after assigning Cardenas duties which he had previously used to help justify a reclassification for another employee and after Cardenas' successful negotiations with AT&T. Finally, Rebo

27

reviewed and approved Massey's allegedly disparate performance reviews of his subordinates. A reasonable jury could conclude from the available evidence that Rebo was deliberately indifferent to, or participated in, Massey's alleged harassment of Cardenas. There is sufficient basis to raise a question of fact as to Rebo's liability on the basis of intentional discrimination under the LAD and under S 1981. We will, therefore, reverse the District Court's grant of summary judgment to Rebo and remand for further proceedings.11

VI.

To summarize, we will reverse the District Court's order granting summary judgment for defendants on Cardenas' disparate pay claims and remand for a determination on the merits as to those claims; we will reverse the District Court's grant of summary judgment to New Jersey on Cardenas' claim of a hostile work environment under Title VII and the LAD; we will reverse the District Court's grant of summary judgment on behalf of Rebo on Cardenas' claim of a hostile work environment under S 1981 and the LAD, and in all other respects we will affirm the District Court's grant of summary judgment.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

11. We have found it difficult to discern the bases of some of Cardenas' claims. On remand, the District Court may use the procedures available under the Federal Rules of Civil Procedure to require Cardenas to narrow and clarify his remaining claims and their evidentiary bases.