**Shannon HIGHTOWER and Jamie Wallace, Plaintiffs,**

v.

**ROMAN, INC., Defendant.**

**Civil Action 00–3847(SSB).**

United States District Court, D. New Jersey.

March 6, 2002.

Michael H. Berg, Alan H. Schorr & Associates, P.C., Marlton, NJ, for Plaintiffs.

Patrick T. Cronin, Cronin and Musto, P.C., Haddonfield, NJ, for Defendant.

## OPINION ON MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

Presently before the Court is Defendant Roman Inc.'s Motion for Summary Judgment. For the reasons set forth herein, Defendant's motion is denied in part and granted in part.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiffs Shannon Hightower ("Hightower") and Jamie Wallace ("Wallace"), African American employees of Defendant Roman, Inc ("Roman"), asserted various Title VII claims against Roman for alleged acts of racial harassment and discrimination. Roman is a New Jersey corporation, primarily in the business of caulking, that was formed in 1994. (Def.'s SOF ¶ 1). Ronald E. Roman ("Ron Jr.") and Scott D. Roman ("Scott") own all the issued stock of the corporation and are the only members of the Board of Directors. (Def.'s SOF ¶ 2–4). Ron Jr. is the President of the corporation, and Scott is the Vice President of the corporation. (Def.'s SOF ¶ 6). Ronald F. Roman ("Ron Sr.") is Ron Jr. and Scott's father. Although Roman alleges that Ron Sr.'s position at Roman was actually that of a "sales person and bidder," (Def.'s SOF ¶ 50), Ron Sr. held himself out to others as the President of Roman. (Pl.'s SOF ¶ 35.) Plaintiffs allege that Ron Sr., as well as Greg Angel ("Angel") and Pasquale Palumbo ("Palumbo"), both employed as foreman and supervisors at Roman, committed various discriminatory acts and created a hostile working environment. (Pl.'s SOF ¶¶ 13–23.)

Hightower was hired by Roman in August of 1994. (Def.'s SOF ¶ 14.) He left Roman in December of 1995, (Def.'s SOF ¶ 17), and returned in the Spring of 1996.

(Def.'s SOF ¶ 21.) Hightower then left his position with Roman again in January of 1997. (Pl.'s SOF ¶ 3.) During his tenure at Roman, he was employed as a laborer, foreman, and caulker mechanic. (Pl.'s SOF ¶ 1.) Wallace was hired by Roman as a laborer in November of 1994. (Def.'s SOF ¶ 32.) On or about August 7, 1996, Wallace was placed in what Roman refers to as a "probationary" Foreman position. (Def.'s SOF ¶ 37.) Wallace alleges that he was never employed as a "probationary Foreman," but was actually in the position of a Foreman. (Pl.'s SOF ¶¶ 1–2.) Roman claims that Wallace was unable to monitor properly the crew to which he was assigned, and on October 16, 1996, he was removed from the foreman position. (Def.'s SOF ¶ 40–41.) On November 11, 1996, Wallace was discharged from Roman's employment because he told Ron Sr. that he "did not have to kiss his ass." (Def.'s SOF ¶ 44.)

Hightower and Wallace allege that, while employed at Roman, they were subjected to numerous derogatory, racial epithets on a daily basis. According to Hightower and Wallace, Palumbo repeatedly referred to them as "niggers" and "spearchuckers." (Pl.'s SOF ¶¶ 65–74.) Palumbo called the African American employees, including Wallace, "coons" and "jigaboos." (Pl.'s SOF ¶ 77.) He specifically referred to Hightower, who has a Caucasian mother and an African American father, as a "halfbreed." (Pl.'s SOF ¶ 78.) Angel also repeatedly referred to Hightower and Wallace as "niggers." (Pl.'s SOF ¶ 69.) Many employees, including Palumbo and Angel, used the term "nigger rig" in the presence of Hightower and Wallace. (Pl.'s SOF ¶ 72.) Hightower alleges that Palumbo and Angel called him a "nigger," "spearchucker," and "jelly bean" in the presence of Ron Sr. on numerous occasions. (Pl.'s SOF ¶ 97.) Wallace claims that he specifically told Palumbo and Ron Sr., as well as

other employees, to stop using racial epithets. (Pl.'s SOF ¶ 100.)

In addition to these racial epithets, Plaintiffs allege that various racial comments were directed at them while employed at Roman. According to Wallace, Ron Sr. told him that there were not many black foremen "because they are lazy and never come to work." (Pl.'s SOF ¶ 79.) Ron Sr. also told Wallace "you better get your black ass in here" and "your black ass will work when I tell you to work." (Pl.'s SOF ¶¶ 81–82.) Angel stated to Wallace that "[t]here are not many black people out here. I could live out here." (Pl.'s SOF ¶ 83.) He also said, referring to Wallace, that "[t]hey hang people like you out here." (Pl.'s SOF ¶ 83.) Notes were placed in African American employees' paychecks, including those of Hightower and Roman that stated "pick no cotton." (Pl.'s SOF ¶¶ 89–90.) When Hightower inquired as to whether these notes were intended to be racial, Ron Sr. responded, "[n]o this is racial, you are fired, you fucking nigger." (Pl.'s SOF ¶ 91.) Various disparaging racial jokes were also made about African Americans at Roman. Angel questioned Wallace by asking, "[w]hat do niggers and apples have in common? They both look good hanging from a tree." (Pl.'s SOF ¶ 87.) Ron Sr. asked Wallace, "[w]hat do aspirin and black people have in common? They're white, they work, and you got to pick cotton to get to them." (Pl.'s SOF ¶ 88.)

Roman has an "Equal Employment Opportunity Policy" ("EEO Policy"), which it alleges was presented to each employee when they commenced work with Roman. (Certification of Ron Jr., Ex. D1). Roman's EEO Policy states that "[a]ny employee who feels that he/she has been discriminated against may communicate directly with Ron Roman for investigation of the complaint." (*Id.*) The document provides a line for the signature of "Ron Roman/President" and a line for the employee's signature. Roman alleges that after an employee was presented with the EEO Policy, he or she was given an opportunity to review the document and ask questions. Roman did not produce a copy of this EEO Policy that was signed by either Hightower or Wallace. Roman alleges that the "Ron Roman" referred to in the EEO Policy document is Ron Jr. (Def.'s SOF ¶ 12.) It is undisputed that neither Wallace nor Hightower made any attempt to communicate with Ron Jr. regarding their claims of discriminatory treatment. (Def.'s SOF ¶ 57.)

Wallace and Hightower assert that they believed Ron Sr. was the actual owner and President of Roman during their employment. (Pl.'s SOF ¶ 38.) Wallace believed Ron Sr. was the owner because he "[s]igned the paychecks. Gave us money for going out of town. He was the first one there in the morning. Sent us on jobs. Told us what to do." (Pl.'s Ex. GG at 10)(Dep. Trans. of Wallace.) In his deposition testimony, Ron Sr. explained that he was in charge of everything at Roman and that he was "the boss." (Pl.'s Ex. DD at 28) (Dep. Trans. of Ron Sr.) He admitted that he "assumed the title of president at some time." (Pl.'s Ex. DD at 25) (Dep. Trans. of Ron Sr.) Ron Sr. also admitted that he signed his name as president of the company on various occasions, such as for employee termination and reprimand forms. (*Id.* at 25–30.) In fact, he signed termination forms for both Hightower and Wallace. (Pl.'s SOF ¶¶ 58–59.) Wallace's termination form indicates that he was terminated because he "showed blatant disrespect to the President of the Company" by his remark "I don't have to kiss your ass"—a statement which was directed at Ron Sr., not Ron Jr. (Pl.'s SOF ¶ 62, Pl.'s Ex. R.) Ron Sr. earned more than any other employee at Roman, including Ron Jr. and Scott, and was one of the few

individuals that had his own office. (Pl.'s SOF ¶¶ 55, 63.)

Ron Sr. was previously the President of Roman Caulking and Waterproofing ("Roman Caulking"), a company that was also primarily in the business of caulking. (Pl.'s SOF ¶¶ 25–27.) Scott and Ron Jr. both worked for their father, Ron Sr., at Roman Caulking and Waterproofing. (Pl.'s SOF ¶ 24.) Roman Caulking went bankrupt in 1994. (Pl.'s SOF ¶ 26.) When it went bankrupt, Roman Caulking sold its assets, including equipment and material, to Roman. (Pl.'s SOF ¶ 30.) Both Roman and Roman Caulking were located at the same location on Commerce Lane in Berlin, New Jersey, and many employees from Roman Caulking began working for Roman. (Pl.'s SOF ¶¶ 31–33; Pl.'s Ex. DD at 73.) Palumbo, one of the alleged harassers, was aware that Ron Sr. was the owner of Roman Caulking and also believed that he continued as owner of Roman. (Pl.'s SOF ¶ 32; Pl.'s Ex. EE at 10–11.)

On January 23, 1997, Wallace filed a complaint of racial discrimination with the New Jersey Division on Civil Rights ("NJDCR") that, by the terms of a "works-haring agreement," was also filed with the Equal Employment Opportunity Commission ("EEOC") (Def.'s SOF ¶ 66; Def.'s Ex. 2.) On February 18, 1997, Hightower also filed a complaint of racial discrimination with the NJDCR and EEOC. (Def.'s SOF ¶¶ 59–60.) On June 12, 1997, the EEOC acknowledged receipt of Wallace's charge and stated that it would allow the NJDCR to initially investigate the charge, (Def.'s SOF ¶ 67, Ex. 13), and on November 26, 1997, the EEOC acknowledge receipt of Hightower's charge and similarly stated that it would allow the NJDCR to initially investigate the charge. (Def.'s

SOF ¶ 61, Exs. 4–5.) On May 17, 2000, Hightower and Wallace both requested that their charges be "withdrawn" from the NJDCR and the EEOC for the stated reason that they wanted "to file a complaint in the Federal District Court and require a 'right to sue' letter." (Def.'s Ex. 15.) On May 24, 2000, the NJDCDR closed the files in both of these cases because the complaints were withdrawn. (Def.'s Ex. 8, 14.) On July 25, 2001, the EEOC issued a "right to sue" letter to Hightower, (Def.'s Ex. 9), and on July 27, 2001, the EEOC issued a "right to sue" letter to Wallace. (Def.'s Ex. 16.) Plaintiffs then filed this suit in federal court on August 7, 2000. (Pl.'s Compl.)

The Court held a motion hearing in this matter on January 28, 2002. At this hearing, Plaintiff Wallace withdrew Count II of his complaint, alleging unequal pay claims.[1] The Court reserved judgment on Defendant's Motion for Summary Judgment.

## II. SUMMARY JUDGMENT STANDARD

The standard for granting a motion for summary judgment is a stringent one, but it is not insurmountable. Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.*, 96 F.3d 66, 69 n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be re-

---

[1] Plaintiff Wallace conceded to the withdrawal of his unequal pay claim because, as argued in Defendant's Motion for Summary Judgment, he failed to raise this claim before the NJDCR or EEOC.

solved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. Nat'l Westminster Bank New Jersey,* 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or ... vague statements"). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. *DISCUSSION*

In its motion for summary judgment, Defendant set forth several issues, each of which is addressed below.

## A. Failure to Exhaust Administrative Remedies

▮ A plaintiff must exhaust all required administrative remedies before bringing a claim for judicial relief. *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997) (citing *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). Before filing a complaint in federal court under Title VII of the Civil Rights Act of 1964 ("Title VII"), a plaintiff must file a charge of discrimination with the EEOC and obtain a "right to sue" letter from the agency. 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 2000e–5(f)(1). The Third Circuit has stated that "[t]he purpose of requiring an aggrieved party to first resort to the EEOC is twofold: to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation." *Glus v. G.C. Murphy Co.,* 562 F.2d 880, 888 (3d Cir. 1977); *see also Robinson,* 107 F.3d at 1020; *Whitehead v. Reliance Ins. Co.,* 632 F.2d 452, 455 (5th Cir.1980) (noting that by requiring a party to file his or her charge with the EEOC before bringing a private suit, Congress intended that "the EEOC be given time to conciliate claims"). Defendant argues that Plaintiffs failed to exhaust their administrative remedies and deliberately attempted to by-pass this administrative mechanism by prematurely withdrawing their charges from the EEOC before it had an opportunity to process them. Plaintiffs respond that they satisfied the necessary prerequisites to file a complaint under Title VII and that the withdrawal of their Title VII charges from the EEOC was never effectuated. The EEOC regulations permit the EEOC to enter into agreements with authorized agents to receive and process charges of discrimination on behalf of the EEOC. 29 C.F.R. § 1601.13. Pursuant to these regulations, the EEOC and NJDCR entered into a "worksharing agreement," which recognizes their common jurisdiction over certain employment discrimination claims and allows each agency to act as agent for the other for the purpose of receiving and processing charges. 29 C.F.R. § 1601.80;

*United States v. Bd. of Educ. of Tp. of Piscataway,* 798 F.Supp. 1093, 1095 n. 1 (D.N.J.1992); (Def.'s Ex. 2.) Thus, when Plaintiffs filed their complaints of racial discrimination with the NJDCR, by virtue of this work-sharing agreement, the complaints were also properly filed with the EEOC.

■■■■■■ A complainant may request a "right to sue" letter from the EEOC after 180 days from the filing of a charge. *Burgh v. Borough Council of the Borough of Montrose,* 251 F.3d 465, 470 (3d Cir. 2001). The receipt of a "right to sue" letter indicates that the complainant exhausted his or her administrative remedies. *Id.* Both Plaintiffs in this case properly received "right to sue" letters from the EEOC more than 180 days after their charges were filed. (Def.'s Exs. 9, 16.) Therefore, it appears that Plaintiffs have satisfied the necessary prerequisites to file suit under Title VII in federal court.

Defendant argues, however, that Plaintiffs' "premature" withdrawal of their EEOC charges constituted a failure to exhaust their administrative remedies and thus the complaint should be dismissed in its entirety. *See Sharon v. Yellow Freight System,* 872 F.Supp. 839, 846 (D.Kan.1994) (holding that "[a] claimant who abandons or withdraws his or her claim before the agency has reached a determination 'cannot be deemed to have exhausted administrative remedies' "); *Brown v. City of New York,* 869 F.Supp. 158, 170 (S.D.N.Y.1994) (holding that Plaintiff "effectively failed to exhaust his remedies" by withdrawing his EEOC claims). In this case, Plaintiffs made a request to the NJDCR to provide the necessary forms to enable them to obtain "right to sue" letters, and the NJDCR forwarded Plaintiffs a form enti-

tled "Request for Withdrawal of Charge of Discrimination." (Pl.'s Brief in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 6; Def.'s Ex. 7.) The withdrawal forms provided a space for Plaintiffs to indicate the reason why they were withdrawing their charges. Both Plaintiffs stated that they "wish[ed] to file a Complaint in the Federal District Court and require [sic] a 'Right to Sue' letter." (Def.'s Ex. 7.) The withdrawal forms sent by the NJDCR required Plaintiffs to request a withdrawal from both the NJDCR and the EEOC, and the Plaintiffs signed these requests to withdraw on May 17, 2000. (Def.'s Ex. 7.) The EEOC issued "right to sue" letters to both Plaintiffs in July of 2000—approximately two months after Plaintiffs withdrew their charges.

This is an issue of first impression in the Third Circuit. The Fifth Circuit decided a factually similar case, *Whitehead v. Reliance Insurance Co.,* 632 F.2d 452 (5th Cir.1980), which the Court finds to be persuasive. In *Whitehead,* the Fifth Circuit held that a party's request to withdraw her complaint from the EEOC and the EEOC's subsequent administrative closure of the case did not bar the complaining party from later bringing suit in federal court. *Id.* Similarly, the Court finds in this case that Plaintiffs' requests to the NJDCR to withdraw their EEOC and NJDCR charges did not constitute an effective withdrawal of the EEOC claims, and Plaintiffs properly exhausted their administrative remedies.

■■■■■ The EEOC regulations specifically state that "[a] charge filed by or on behalf of a person claiming to be aggrieved may be withdrawn only by the person claiming to be aggrieved and only with the consent of the Commission."[2] 29 C.F.R.

---

**2.** This regulation also delegates authority to "District Directors, Area Directors, Local Directors, the Program Director, Office of Program Operations, Director of Systemic

Programs, Office of Program Operations, or Directors Field Management Programs, Office of Program Operations, or their designees" to grant consent to a request to with-

§ 1601.10. Consent of the Commission is required because the EEOC may elect to deny a charging party's request to withdraw his or her EEOC charges and "proceed on its own initiative to prosecute a civil action." *EEOC v. Walner*, 91 F.3d 963, 969 (7th Cir.1996) (citation omitted). The EEOC may determine that "the broader purposes of Title VII require it to continue its efforts even after the charging party has been sufficiently satisfied that he requests withdrawal of the charge." *Whitehead*, 632 F.2d at 458. Thus, a request for withdrawal of a charge is not effective until the EEOC has given its express consent. *Id.* at 458; *see also Walner*, 91 F.3d at 969, 971. The preprinted withdrawal forms signed by Plaintiffs, which are similar to the withdrawal forms sent to the plaintiff in *Whitehead*, even state that:

> [i]f you desire to withdraw your charge with both agencies [EEOC and NJDCR], it will be necessary to indicate this in the space provided below. Since *a request for withdrawal of the charge is subject to the approval of the agencies named above,* your request will be considered and acted upon when received.

(Def.'s Ex. 7) (emphasis added). Just as in *Whitehead*, there is nothing in the present record which suggests that the EEOC recognized or consented to Plaintiffs' requests to withdraw their EEOC charges, and thus there was not an effective withdrawal of these claims.

The present case is easily distinguished from *Brown v. City of New York*, 869 F.Supp. 158, 170 (S.D.N.Y.), a case cited by Defendant in support of his argument. In *Brown*, the court held that by withdrawing his Title VII claim, the plaintiff effectively failed to exhaust his administrative remedies. In that case, however, the EEOC recognized and consented to plaintiff's withdrawal in a letter stating that his charge was "deemed withdrawn." *Id.* at 170. Additionally, the EEOC never issued the plaintiff a "right to sue" letter in that case. *Id.* Plaintiffs in this case, on the other hand, received no recognition from the EEOC that the charges were withdrawn and did receive a "right to sue" letter from the EEOC—thereby satisfying the necessary prerequisites to file suit under Title VII. Although Plaintiffs received a letter from the NJDCR indicating that their files were closed, this does not serve as recognition or consent to a withdrawal of their EEOC charges. The NJDCR is authorized to act as agent for the EEOC in certain circumstances. The agency does not, however, have the authority to effectuate a withdrawal of a charging party's complaint from the EEOC. *See* 29 C.F.R. § 1601.10.

Defendant's apparent concerns regarding Plaintiffs' "deliberate attempt" to bypass the administrative mechanism mandated by Congress and the EEOC's failure to process or investigate Plaintiffs' charges are unfounded. In its notice of a charge of discrimination to Defendant, the EEOC explained that it may await the issuance of the NJDCR's final findings and orders before investigating the charge. (Def.'s Ex. 12.) The notice of a charge of discrimination further states that "[i]n many instances the [Equal Employment Opportunity] Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission." The work-sharing agreement between the NJDCR and EEOC was in fact "designed to provide individuals with an efficient procedure for obtaining redress for their grievances under appropriate New Jersey or Federal laws." (Def.'s Ex. 2.) In this case, the EEOC did

---

draw a charge. 29 C.F.R. § 1601.10. The NJDCR is not listed as an agent that may

consent to a claimant's request for withdrawal.

not investigate Plaintiffs' charges, but allowed the NJDCR to do so. The investigation process initiated by the NJDCR spanned over a three-year period and resulted in the issuance of a determination of probable cause in favor of Plaintiffs. (Pl.'s Opp'n at 12.) Although the EEOC did not investigate Plaintiffs' allegations or propose settlement negotiations between the parties, the NJDCR properly performed these functions and acted in furtherance of both agencies' goal to provide a just and efficient alternative to the court system.

The Court thus holds, based upon the facts of this case and the logic of the Fifth Circuit, that Plaintiffs exhausted their administrative remedies. Accordingly, it is the approval by the EEOC of a request for withdrawal of charges, and not the actual request for withdrawal, that effectuates the withdrawal for the purposes of exhausting administrative remedies. Plaintiffs properly followed administrative procedure by initially filing their charges with the EEOC and then obtaining "right to sue" letters more than 180 days after filing their initial charges. The EEOC was in possession of both the request to withdraw and the request for a right to sue letter when it proceeded to issue both Plaintiffs right to sue letters. The EEOC issued these letters before resolving or even addressing Plaintiffs' requests for a withdrawal. Therefore, Plaintiffs did not fail to exhaust their administrative remedies and Defendant's request for summary judgment as to this issue must be denied.

## B. Prima Facie Case for Hostile Work Environment Claim

Title VII makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The scope of protection provided by Title VII includes protection against a hostile work environment that is abusive to an employee on the basis of his or her race. *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir.2001); *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)). In order to establish a hostile work environment claim under Title VII, a plaintiff must show that "(1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability." *Cardenas*, 269 F.3d at 260 (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996)); *see also Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 276–77 (3d Cir. 2001); *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir.1999). The harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *West*, 45 F.3d at 753 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)) (internal quotations omitted). The Court must look at the "totality of the circumstances" to determine whether there is a hostile work environment. *Cardenas*, 269 F.3d at 260–61; *West*, 45 F.3d at 753.

Defendant argues that the harassment was not so severe or pervasive as to alter the terms and conditions of the employment relationship. The Court finds, however, that Plaintiffs have provided sufficient evidence of an actionable hostile work environment to survive summary judgment. While employed at Roman, Plaintiffs were continually referred to as

"niggers," "spearchuckers," "coons," and "jigaboos" by their supervisors. In addition to these derogatory racial epithets, various racial comments were directed at them while employed at Roman. Ron Sr. told Wallace: (1) that there were not many black foremen "because they are lazy and never come to work"; (2) "you better get your black ass in here"; and (3) "your black ass will work when I tell you to work." Angel stated to Wallace that "[t]here are not many black people out here. I could live out here." Then he said, referring to Wallace, that "[t]hey hang people like you out here." When Hightower inquired as to whether a note in his paycheck that stated "pick no cotton" was intended to be racial, Ron Sr. responded, "[n]o this is racial, you are fired, you fucking nigger." Various disparaging racial jokes were also made about African Americans in the presence of Plaintiffs. Angel questioned Wallace by asking, "[w]hat do niggers and apples have in common? They both look good hanging from a tree." Ron Sr. added, "[w]hat do aspirin and black people have in common? They're white, they work, and you got to pick cotton to get to them." The Court recognizes that idle workplace banter and mere discourtesy or rudeness in the workplace does not suffice to establish a claim for hostile work environment. *Mobley v. City of Atlantic City Police Dept.*, 2000 WL 363692, at *6 (D.N.J. March 30, 2000) (noting that Title VII should not become trivialized as a "general civility code") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). The Court finds, however, that Plaintiffs' allegations of numerous intentional and derogatory racial epithets, comments, and "jokes" are sufficient to establish the existence of "pervasive and regular" harassment at this stage of the litigation.

▮ Plaintiffs allege, and the Court presumes the truth of their assertions for the purposes of this motion, that they were detrimentally affected by the discriminatory conduct. Hightower claimed that he felt "humiliated, disrespected, and angry." (Pl.'s Opp'n at 19.) Wallace claimed that he "had a reaction to stress, experienced insomnia, and was depressed." (*Id.*) Plaintiffs' assertions introduce genuine issues of material fact regarding the severity and pervasiveness of the harassment as well as its detrimental effect on Plaintiffs. *See, e.g., Cardenas*, 269 F.3d at 263 (holding that plaintiff's claim survived summary judgment because a jury could determine that a hostile work environment existed based upon discriminatory comments and facially neutral mistreatment). Thus, the Court concludes that Plaintiffs have provided sufficient evidence of an actionable hostile work environment to survive summary judgment.

### C. Affirmative Defense

▮ An employer is subject to vicarious liability under Title VII for a hostile work environment created by a supervisory employee. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Cardenas*, 269 F.3d at 266. An employer may raise an affirmative defense, however, that limits its liability. *Faragher*, 118 S.Ct. at 2293; *Cardenas*, 269 F.3d at 266. The employer must establish two elements by a preponderance of the evidence for this affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 118 S.Ct. at 2293; *see also Cardenas*, 269 F.3d at 266. This defense is not available when the supervisor's harassment results in a tangible em-

ployment action, such as discharge, demotion, or undesirable reassignment. *Id.*

Defendant claims that Plaintiffs unreasonably failed to avail themselves of the remedial measures available to them and thus the Court should grant summary judgment in its favor. Defendant has an "Equal Employment Opportunity Policy" ("EEO Policy"), which it alleges was presented to every employee when they commenced work with Roman. Roman's EEO Policy states that "[a]ny employee who feels that he/she has been discriminated against may communicate directly with Ron Roman for investigation of the complaint." The EEO policy provides a line for the signature of "Ron Roman/President" and a line for the employee's signature. Defendant claims that the "Ron Roman" referred to in the EEO Policy document is Ron Jr. It is undisputed that neither of the Plaintiffs made any attempt to communicate with Ron Jr. regarding their claims of discriminatory treatment.

Plaintiffs claim that the EEO policy in place was not an effective anti-harassment policy and that Defendant failed to discuss this policy with its employees. (Pl.'s Opp'n at 33.) Defendant, in fact, was unable to produce a copy of the EEO policy that was signed by either of the Plaintiffs. Plaintiffs also argue that even if they had been made aware of the EEO policy, they would have assumed the "Ron Roman/President" in the document referred to Ron Sr., not Ron Jr. (Pl.'s Opp'n at 25.) Plaintiffs allege that Ron Sr. assumed various duties of an owner or President, such as signing and distributing paychecks, sending employees on jobs, giving orders, and signing termination and reprimand forms. Ron Sr. even admitted that he assumed the title of President of Roman, signed his name as President of the company, and that he was "the boss." (Pl.'s Ex. DD at 25–30) (Dep. Trans. of Ron Sr.) In fact,

Wallace's termination form indicates that he was terminated because he "showed blatant disrespect to the President of the Company" by his remark "I don't have to kiss your ass"—a statement which was directed at Ron Sr. (Pl.'s SOF ¶ 62, Pl.'s Ex. R.) In addition, Ron Sr. was the President of Roman Caulking, a company that was also primarily in the business of caulking and went bankrupt in 1994. (Pl.'s SOF ¶¶ 25–27.) When it went bankrupt, Roman Caulking sold its assets to Roman, and many employees from Roman Caulking began working for Roman. (Pl.'s SOF ¶ 30.) Both Roman and Roman Caulking were located at the same location on Commerce Lane in Berlin, New Jersey. (Pl.'s SOF ¶ 31.) Palumbo, one of the alleged harassers, was aware that Ron Sr. was the owner of Roman Caulking and believed that he continued as owner of Roman. (Pl.'s SOF ¶ 32; Pl.'s Ex. EE at 10–11.)

The above evidence suggests that it was reasonable for Plaintiffs to believe Ron Sr., not Ron Jr., was the "Ron Roman/President" being referred to in the EEO Policy and thus the individual they were expected to communicate with regarding investigation of a discrimination complaint. As Ron Sr. was an active participant in the harassment and it is unclear whether employees were even made aware of Defendant's EEO policy, the Court finds there is a genuine issue of material fact regarding whether Defendant established a reasonable or effective method to prevent or correct discriminatory behavior. *See e.g. Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998) (holding that defendant did not exercise reasonable care to prevent the supervisor's harassing conduct because the harassment policy was not disseminated to the employees, officials made no attempt to keep track of the conduct of supervisors, and the policy did not provide a method to bypass the harassing supervisors to regis-

ter complaints). Moreover, it would not seem unreasonable for Plaintiffs to fail to report acts of racial harassment to Ron Sr., an active participant in the harassment, in their belief that he was the President of Roman and thus the individual with whom they were to discuss these matters. As there are genuine issues of material fact regarding the reasonableness of both parties' actions, the Court holds that Defendant did not sufficiently establish its affirmative defense and thereby denies summary judgment on this basis. *Cardenas* 269 F.3d at 267 (finding that summary judgment based on the affirmative defense would be premature because there were factual issues outstanding as to the reasonableness of the parties' actions).

**D. Constructive Discharge Claim**

 Count III of Plaintiffs' complaint alleges that Hightower was constructively discharged when he left his position with Roman in January of 1997 because he left as a result of the racially harassing and discriminatory acts of Defendant. A plaintiff who voluntarily resigns may assert a claim of constructive discharge "when the employer's allegedly discriminatory conduct creates an atmosphere that is the constructive equivalent of a discharge." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1075 (3d Cir.1996) (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir. 1992)). The Court must use an objective test to determine whether "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir.1996)).

 Defendant argues that because Plaintiffs did not report the alleged incidents to Ron Jr. or Scott, the owners of Roman, it cannot be held liable under a claim for constructive discharge because they did not "knowingly" permit conditions of discrimination in employment. The cases cited by Defendant for this proposition merely discuss the severity of defendant employer's actions and whether these actions were sufficiently intolerable to justify a claim for constructive discharge. Discriminatory conduct of the "employer" sufficient for a claim of constructive discharge does not necessarily only refer to the knowledge or conduct of the owners of the corporation. Furthermore, as discussed above, Plaintiffs reasonably believed that Ron Sr., an active participant in the harassment, was the owner and President of Roman, and there is a genuine issue of material fact regarding the nature of his position at Roman. Defendant cannot be relieved from liability under a constructive discharge claim merely because the actual owners of the company were not aware of the alleged discriminatory actions. Plaintiffs presented sufficient evidence to raise a genuine issue of material fact regarding whether their working conditions were "so intolerable that a reasonable person subject to them would resign." *Id.* Thus, Plaintiffs' claim for constructive discharge survives summary judgment.

**E. Punitive Damages**

 Punitive damages are available in Title VII cases when the defendant employer engages in a discriminatory practice with "malice or reckless indifference to the federally protected rights of an individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court held that punitive damages liability can be imposed upon an employer for the discriminatory behavior of its agent when "an employee serving in a managerial capacity committed the wrong while acting in the scope of employment." *Id.* at 543, 119 S.Ct. 2118. Yet,

liability will not be imposed on an employer when its agent's "discriminatory employment decisions ... are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545, 119 S.Ct. 2118 (internal quotations omitted). Defendant argues that the Court should dismiss Plaintiffs' claim for counsel fees and punitive damages because the owners of Roman were not aware of the discrimination, and it had a written anti-discrimination policy in place which evidenced a good-faith effort to comply with Title VII.

█ Although *Kolstad* established that employers may limit their liability for the actions of managerial employees in certain circumstances, it still remains true that "an individual sufficiently senior in the corporation must be treated as the corporation's proxy for purposes of liability." *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 516 (9th Cir.2000) (holding that employees with positions sufficiently high up in the company are considered proxies and thus would prevent the company from asserting a vicarious liability defense to punitive damages). As discussed above, there are genuine issues of material fact regarding the nature of Ron Sr.'s position at Roman and whether he was "sufficiently senior" to be considered a proxy of the corporation. Moreover, there is a genuine issue of material fact regarding the reasonableness of Defendant's EEO Policy that would prevent the Court from finding that it made a good-faith effort to comply with Title VII. Thus, Defendant's motion for summary judgment as to the punitive damages claim must be denied.

### F. "John Doe" Defendants

█ Pursuant to Federal Rule of Civil Procedure 21, "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21. This Rule has been invoked to drop John Doe defendants from a case when plaintiffs failed to include specific allegations of wrong doing committed by these defendants. 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1683. Count IV of Plaintiffs' complaint names "John Does 1–50," described as fictitious persons or corporations, as Defendants to the present action. Plaintiffs state in their complaint that "[a]lthough [they] believe that the acts complained of were performed or caused by the Defendant, and individuals identified therein, [they] cannot be sure that the named Defendant is the only entity liable for the actions complained." In their opposition brief and as late as the January 28, 2002 motion hearing held before the Court, Plaintiffs admit that they have no knowledge of any other entities that may be liable to them. Although Plaintiffs initiated this suit over a year and a half ago and have completed extensive discovery, they have as of yet failed to establish the identities of John Does 1–50 and have not set forth any evidence of wrong doing by John Doe defendants. Thus, the Court finds that, upon motion of Defendant, it is necessary to dismiss John Does 1–50 from the present action at this point in the litigation. *See, e.g., Atlantic Used Auto Parts v. City of Philadelphia*, 957 F.Supp. 622, 625 (E.D.Pa.1997).

### IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted in part and denied in part.